SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

## State v. David Bass (a/k/a Robert Hines) (A-118-13) (072669)

**Argued October 14, 2015 -- Decided March 7, 2016**

**PATTERSON, J., writing for a unanimous Court.**

In this appeal, the Court considers three issues that arise from defendant's trial and conviction for murder and related offenses: (1) the limitation on defense counsel's cross-examination of the State's lead witness; (2) the admission of expert testimony by a surrogate for the medical examiner who conducted the victim's autopsy and died prior to trial; and (3) the absence of a jury instruction addressing the use of force against an intruder.

On December 20, 2006, Jessica Shabazz was shot and killed, and James Sinclair was wounded, at a motel in Neptune Township. Defendant David Bass was arrested shortly thereafter. He admitted that, prior to the shooting, he had smoked crack cocaine with Shabazz and Sinclair in his motel room, that he and Shabazz had argued, and that he shot Shabazz and Sinclair. Defendant asserted, however, that he used his weapon in self-defense. Following a fifteen-day trial, a jury convicted defendant of the murder of Shabazz, the attempted murder of Sinclair, and two weapons offenses. He was sentenced to a sixty-year aggregate term of incarceration.

Defendant raised several challenges on appeal, including the three issues that form the basis of the instant appeal. The first issue arose from the trial court's limitation on defense counsel's cross-examination of Sinclair, the State's lead witness. Counsel sought to establish bias by inquiring about the provisions of Sinclair's plea agreement for an offense committed after the shooting in this case. Sinclair had pled guilty to third-degree theft and burglary and was sentenced to probation prior to defendant's trial, rather than proceeding on charges of first-degree robbery with a possible life sentence. The trial court barred counsel from exploring the plea bargain in cross-examination.

Second, defendant challenged the admission of the expert testimony of Dr. Frederick DiCarlo, an assistant medical examiner, who testified as a surrogate for Dr. Jay Peacock, the medical examiner who conducted the autopsy of Shabazz and died prior to trial. During Dr. DiCarlo's testimony, defense counsel objected to the expert's "parroting" of Dr. Peacock's findings. Although counsel did not specifically invoke the Confrontation Clause, he stated that Dr. DiCarlo should be permitted to testify only about his "own independent observations of the autopsy photographs and things of that nature," and should not testify about the late Dr. Peacock's observations. The court ruled that Dr. DiCarlo was permitted to testify about the opinions expressed by Dr. Peacock in the autopsy report.

Third, defendant argued that the trial court should have charged the jury regarding the use of force that is permissible when an individual is confronted in his or her dwelling by an "intruder." Although defendant admitted Shabazz and Sinclair into his room, he argued that they became "intruders" because they intended to rob him.

The panel rejected each argument and affirmed defendant's conviction and sentence. The Court granted defendant's petition for certification. 221 N.J. 284 (2014).

**HELD**: The limitation on defendant's cross-examination of Sinclair constituted reversible error. Defendant is entitled to a new trial on the charges of murder, attempted murder and the possession of a weapon for an unlawful purpose. In addition, the substitute expert read portions of the deceased medical examiner's autopsy report to the jury, rather than testifying based on his own observations and conclusions, which violated defendant's confrontation rights. On retrial, any expert testimony by a substitute medical examiner should conform to State v. Michaels, 219 N.J. 1, cert. denied, 135 S. Ct. 761, (2014), and State v. Roach, 219 N.J. 58 (2014), cert. denied, 135 S. Ct. 2348 (2015). Defendant was not entitled to an instruction on the use of force against an intruder because he voluntarily admitted the victims to his room.

1. In criminal trials, the claimed bias of a witness is generally an appropriate inquiry in cross-examination. A claim that there is an inference of bias is particularly compelling when the witness is under investigation, or charges are

pending against the witness, at the time that he or she testifies. Nonetheless, a charge need not be pending at the time of trial to support an inference of bias. A charge that has been resolved before the witness testifies may be an appropriate subject for cross-examination. Moreover, a charge against a prosecution witness that is unrelated to the charge against the defendant may be an appropriate topic for cross-examination. The case law envisions that a trial court will undertake a careful evaluation of a defendant's claim that a witness is biased. (pp. 17-24)

2. Here, the trial court barred defendant from exploring the terms of the plea bargain that led to the dismissal of Sinclair's unrelated first-degree robbery charge and probationary sentence. The pendency of a first-degree charge may have served as a powerful incentive for Sinclair to cooperate with the State. The jury should have been told that, after the shooting at issue in this case, Sinclair allegedly committed an offense that exposed him to a lengthy term of incarceration. The jury also should have been made aware that Sinclair entered into a plea bargain with the State, and that, by virtue of his plea, Sinclair faced probation rather than a lengthy prison term. Defendant was entitled to explore that history, and the court erred when it barred counsel from pursuing this line of questioning. Had the jury been aware that Sinclair was charged with a separate armed robbery and faced exposure to more than a life sentence, and that he and the State entered into a plea agreement that reduced his first-degree offense to third-degree charges with a term of probation, it may well have drawn an inference of bias. The trial court's error was not harmless beyond a reasonable doubt, in light of Sinclair's pivotal role in defendant's trial. Accordingly, defendant is entitled to a new trial on the charges of knowing or purposeful murder and attempted murder. (pp. 24-33)

3. The Court next considers the court's admission of the expert testimony of Dr. DiCarlo, the medical examiner who testified about the autopsy as a substitute for the deceased Dr. Peacock. In 2014, in Michaels, supra, 219 N.J. at 18-32, and Roach, supra, 219 N.J. at 74-80, this Court analyzed the United States Supreme Court's recent Confrontation Clause jurisprudence. In Michaels, the Court explained, "a truly independent reviewer or supervisor of testing results can testify to those results and to his or her conclusions about those results, without violating a defendant's confrontation rights, if the testifying witness is knowledgeable about the testing process, has independently verified the correctness of the machine-tested processes and results, and has formed an independent conclusion about the results." 219 N.J. at 45-46. The Court, therefore, held that the State's expert in Michaels was properly permitted to testify because "he testified to the findings and conclusions that he reached based on test processes that he independently reviewed and verified." 219 N.J. at 46. Similarly, in Roach, the Court explained that a co-worker could testify as to the results of testing conducted by an analyst who does not appear at trial, provided that the testifying witness is "a truly independent and qualified reviewer of the underlying data and report," and the witness does not "merely parrot the findings of another." 219 N.J. at 79-80. (pp. 33-40)

4. The principles stated in Michaels and Roach apply in this setting. A testimonial report that is not admitted into evidence can engender a violation of the Confrontation Clause if that report is "integral" to the testimony of a substitute witness. Roach, supra, 219 N.J. at 76-77. Instead of limiting its examination of Dr. DiCarlo to his independent observations and analysis, the State prompted him to read the contents of various portions of Dr. Peacock's autopsy report, as if Dr. DiCarlo had been present at the autopsy and Dr. Peacock's findings were his own. Thus, Dr. DiCarlo was permitted to engage in precisely the type of "parroting" of the autopsy report that has been held to violate the Confrontation Clause. On retrial, any expert testimony regarding the autopsy of Shabazz should conform with the requirements set forth in the Court's opinion. (pp. 40-46)

5. The final issue raised in this appeal is whether the trial court properly declined defendant's request to instruct the jury about the use of force that may be used against an intruder. The term "intruder" denotes an individual who enters, or attempts to enter, a dwelling uninvited. That term does not extend to an individual who is invited into a dwelling by the resident, and is a guest in that dwelling for a period of time before the use of force occurs. In this case, the trial court properly declined to give the "intruder" charge because the evidence clearly established that defendant voluntarily invited Shabazz and Sinclair into his motel room. (pp. 47-51)

The judgment of the Appellate Division is **AFFIRMED**, in part, and **REVERSED**, in part, and the matter is **REMANDED** to the trial court for proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion. JUSTICE FERNANDEZ-VINA did not participate.**

2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

          v.

DAVID BASS (a/k/a ROBERT HINES),

    Defendant-Appellant.

> Argued October 14, 2015 – Decided March 7, 2016
>
> On certification to the Superior Court, Appellate Division.
>
> Michael J. Confusione, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney).
>
> Frank Muroski, Deputy Attorney General, argued the cause for respondent (John J. Hoffman, Acting Attorney General of New Jersey, attorney).

JUSTICE PATTERSON delivered the opinion of the Court.

In the early morning hours of December 20, 2006, Jessica Shabazz was shot and killed, and James Sinclair was wounded, at a motel in Neptune Township. Defendant David Bass was arrested shortly thereafter. He admitted to police that, prior to the shooting, he had smoked crack cocaine with Shabazz and Sinclair in his motel room, that he and Shabazz had argued over money, and that he shot Shabazz and Sinclair with his handgun. Defendant asserted, however, that he used his weapon in self-

1

defense after Shabazz briefly wrested his gun from him, Sinclair assaulted him, and both attempted to rob him. A jury convicted defendant of the knowing or purposeful murder of Shabazz, the attempted murder of Sinclair, and two weapons offenses. He was sentenced to a sixty-year aggregate term of incarceration.

On appeal, defendant challenged three determinations by the trial court. The first issue arose from the trial court's limitation on the cross-examination of the State's lead witness, Sinclair. Charged with first-degree robbery for an offense committed after the shooting in this case, Sinclair faced exposure to a life sentence of incarceration. Pursuant to his plea agreement with the State, Sinclair pled guilty to third-degree theft and burglary and was sentenced to probation prior to defendant's trial. In his cross-examination of Sinclair, defense counsel was barred from inquiring about the provisions of Sinclair's plea agreement. Second, defendant challenged the trial court's admission of the expert testimony of a medical examiner, who testified as a surrogate for another medical examiner who had conducted the autopsy of Shabazz, because that medical examiner died prior to defendant's trial. Third, defendant contended that the trial should have charged the jury regarding the permissible use of force against an intruder. The Appellate Division affirmed defendant's conviction and sentence, and we granted defendant's petition for certification.

We affirm in part and reverse in part the judgment of the Appellate Division. We hold that the trial court's limitations on defendant's cross-examination of Sinclair constituted reversible error. Given the timing of Sinclair's plea agreement and its favorable terms, the jury could have drawn an inference of bias had it been fully informed. Moreover, the trial court's error was not harmless beyond a reasonable doubt, in light of Sinclair's pivotal role in defendant's trial. Therefore, defendant is entitled to a new trial on the charges of murder, attempted murder and the possession of a weapon for an unlawful purpose.

We also reverse the Appellate Division's judgment affirming the trial court's admission of the expert testimony of a substitute medical examiner regarding the autopsy of Shabazz. Following defendant's trial and the Appellate Division decision in this case, this Court decided State v. Michaels, 219 N.J. 1, cert. denied, ___ U.S. ___, 135 S. Ct. 761, 190 L. Ed. 2d 635 (2014), and State v. Roach, 219 N.J. 58 (2014), cert. denied, ___ U.S. ___, 135 S. Ct. 2348, 192 L. Ed. 2d 148 (2015). In accordance with the principles set forth in Michaels and Roach, the State may present the testimony of a qualified expert who has conducted independent observation and analysis regarding an autopsy conducted by a medical examiner who is unavailable to testify at trial, without violating the defendant's

3

confrontation rights under the Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution.

In defendant's trial, however, the substitute expert was permitted to read to the jury portions of the deceased medical examiner's autopsy report, rather than testify based on his own observations and conclusions. Accordingly, the trial court's admission of that testimony violated defendant's confrontation rights under federal and state law. On retrial, any expert testimony offered on behalf of the State by a substitute medical examiner should conform to the standards of Michaels and Roach.

Finally, we concur with the Appellate Division that because defendant voluntarily admitted Shabazz and Sinclair to his motel room, he was not entitled to a jury instruction addressing the use of force against an intruder.

I.

On December 19, 2006, defendant, a fifty-five-year-old resident of Rochester, New York, drove a rented car from his home to Neptune Township. He checked into a motel, and was assigned a room on the ground floor, with a sliding glass door leading to a small patio. Defendant carried approximately seventy thousand dollars in cash, concealed in a hidden compartment of one of his two suitcases, and several thousand

4

dollars in his billfold.  He also brought a handgun to the motel, and stored it under the mattress in his room.

Defendant drove from the motel to Asbury Park late in the afternoon.  There, he met Antoinella Johnson, the daughter of a woman who had been defendant's neighbor when he lived in Asbury Park.  According to Johnson, she and defendant then spent several hours together.  Johnson used money that defendant gave her to make several purchases.  She bought crack cocaine, clothing and toiletries for herself, women's lingerie for defendant, alcohol, lottery tickets, and cigarettes.  Defendant and Johnson then went to defendant's motel room.  Johnson later testified that in the motel room, defendant changed into the women's clothing that Johnson had bought at his direction, and they both smoked crack cocaine.  Johnson stated that twice in the course of the evening, defendant sent her out to purchase more crack cocaine, using his car, and that the second time he did so, he suggested that she bring back a friend.

According to Johnson, she was unhappy about the prospect of sharing defendant's attention and money with another woman but followed his instructions nonetheless.  Driving defendant's car, she located her friend, nineteen-year-old Shabazz, and asked whether she wanted to meet defendant in his motel room.  Shabazz agreed to go with her.  A friend of Shabazz, Deborah Brisco, would later testify for the defense that before leaving for

defendant's motel room, Shabazz asked Brisco whether she wanted to "do a job." According to Brisco, doing a "job" meant "finding a trick, taking him to a motel room, getting him high and robbing him," but not violence. Brisco testified that she refused Shabazz's offer.

Briefly diverted by a flat tire on defendant's car, Johnson and Shabazz purchased more crack cocaine with money that defendant had provided, and then drove to the motel, where Johnson introduced Shabazz to defendant. Johnson recounted that after the three smoked crack cocaine in the motel room, defendant sent Johnson out to buy more drugs. Johnson was gone for two to three hours. When Johnson did not immediately come back to the room, defendant gave Shabazz two hundred dollars and asked her to go out for more cocaine. Johnson briefly returned, accompanied by her stepmother, Linda Bradley, but left again after a few minutes.

When Shabazz returned in a taxi, between two o'clock and two-thirty a.m., she was accompanied by Sinclair, who would later testify that he brought cocaine to sell to defendant. The taxi driver testified that when he dropped Shabazz and Sinclair at the motel, they were admitted to the room through the glass door by a person who, the driver believed, was a woman who was high or drunk. According to Sinclair, it was defendant, dressed in women's clothing, who admitted him and Shabazz to the room.

6

Sinclair testified that after he arrived, he sat in a chair drinking, smoking crack cocaine, and sending text messages on his cellphone. He stated that defendant and Shabazz immediately began to argue about money, alternating between their heated disagreement and periods of calm in which both smoked crack cocaine. When defendant briefly left them alone, Shabazz explained to Sinclair that defendant owed her money for sexual services that she had provided to him earlier that evening. Defendant would later tell police that he had intended to pay Shabazz for her services but had decided against doing so because he realized that he was being cheated in Shabazz's purchases of drugs.

A half hour after Shabazz and Sinclair arrived, they were joined by Johnson and Bradley. Johnson was upset to see Sinclair present. According to Johnson, she loudly expressed her anger to Shabazz. She told Shabazz and Sinclair to leave, but defendant urged them to stay. After another period of relative calm in which the five occupants of the room smoked crack cocaine, the dispute escalated again. Shabazz attempted to take defendant's leather jacket, and defendant grabbed her by the arm to prevent her from doing so.

At that point, Johnson and Bradley left the motel room. In Johnson's words, they "did not want to get into any trouble." Both were concerned about what was about to happen in the room;

7

Johnson later told police that she anticipated that Sinclair and Shabazz might rob defendant, and Bradley testified that when she left, she thought that Sinclair and Shabazz were stealing from defendant. Following the departure of Johnson and Bradley, only defendant, Shabazz, and Sinclair remained in the motel room.

Sinclair and defendant would later provide sharply divergent accounts of the events that followed. Sinclair testified that as the argument between defendant and Shabazz continued, defendant approached the bed where Shabazz was sitting. According to Sinclair, Shabazz "like pushed [defendant] away, like get the f**k out of here," and defendant backed off, anxiously pacing the floor. Sinclair stated that Shabazz briefly grabbed one of defendant's suitcases, and defendant grabbed it back.

Sinclair stated that a moment later, he looked up from his phone to see defendant holding a "gigantic gun," aimed at Shabazz, and that defendant said to Shabazz, "you think this is a f****g game?" Sinclair contended that he tried to "negotiate" with defendant, offering to "take [Shabazz] and get the f**k out of here" but that defendant persisted, commenting "ah, b***h think this is a game." According to Sinclair, he "grabbed [defendant] and pushed him, and I pushed him toward the bathroom," then grabbed Shabazz off the bed, "snatched" the sliding door open and "slung" Shabazz out the door. Sinclair

8

stated that, as he fled, he did not look back at defendant, who was behind him in the room. It was at that point, Sinclair said, that he heard defendant's first shot, which hit him in the hand, and two more shots, one of which hit Shabazz.

Defendant provided to police a different account of the final moments before the shooting. He insisted that he acted in self-defense. He stated that Shabazz and Sinclair "attack[ed] me first," and that Sinclair "grabbed me by the throat and pushed me back to the wall." He said that he was trying to retrieve his gun, which was under the mattress on which Shabazz was sitting, but she "read [his] body language" and went for the gun herself. Defendant said he "tussled with [Shabazz]" and got the gun back. Defendant stated that Shabazz and Sinclair ran, taking defendant's money, and that Sinclair reached the door first. Defendant said he fired shots because he "didn't want [Sinclair] to hurt me . . . . I just didn't want to get hurt," and that he "didn't mean to shoot her," and that she "moved in the way" just as he shot at Sinclair. Defendant said that the initial shots were fired in the room, but admitted that he fired additional shots at Sinclair when he was outside in the parking lot.

The gunshots at the motel prompted a call to police. Shabazz was found lying face down on the ground with a bullet

9

wound in her back.  She was pronounced dead by paramedics at the scene.

Defendant attempted to leave the motel after the shooting, towing two suitcases.  Approached by police officers, defendant claimed that he had been interviewed and released by police, and that he was not the person they were looking for.  Defendant was detained and taken to the police station.  Late that afternoon, defendant gave two successive statements to police after waiving his Miranda[1] rights.  In his first statement, defendant denied involvement in the shooting and then invoked his right to counsel.  Shortly thereafter, he asked to see the investigating officers again.  In a second statement, defendant admitted shooting Shabazz and Sinclair.  At that point, he asserted his claim of self-defense for the first time.

That same day, searching the area in which defendant had been observed, officers found a gun which was later identified, through ballistics analysis, as the gun used in the shooting of Shabazz and Sinclair.

After running from the motel, Sinclair flagged down a taxi driven by an acquaintance.  Sinclair sought neither the assistance of law enforcement nor medical attention for the

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

10

gunshot wound to his hand.  Instead, he directed the taxi driver to take him to the home of a friend, where he smoked crack cocaine.  Police officers found him hours later, and took him to a hospital, where surgeons amputated a finger.  When he was located by police, Sinclair had in his possession defendant's billfold, which contained defendant's identification and credit cards.  He stated that Shabazz had slipped the billfold into his pocket in defendant's motel room but offered no further explanation for his possession of the billfold.

The Monmouth County Medical Examiner, Dr. Jay Peacock, performed Shabazz's autopsy a few hours after her death.  Two law enforcement officers, the Monmouth County detective leading the investigation and a Neptune Township police officer, were present at the autopsy, and collected fingerprints and other evidence for use in their investigation.  In his autopsy report, Dr. Peacock concluded that Shabazz died from a single bullet that entered her lower back, traveled through a portion of her heart and right lung, and exited through her chest.

## II.

A grand jury charged defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); first-degree attempted murder, N.J.S.A. 2C:5-1, 2C:11-3(a)(1) and (2); third-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) and N.J.S.A. 2C:58-4; second-degree possession of a weapon for an unlawful purpose,

11

N.J.S.A. 2C:39-4(a)(1); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1).

Defendant was tried before a jury in a fifteen-day trial. The first of the three issues raised in this appeal arose during the State's case-in-chief, prior to the testimony of its key witness, Sinclair. The parties disputed the scope of defendant's cross-examination of Sinclair concerning his most recent criminal offense, the alleged robbery of a residence on January 20, 2008. Pursuant to Sinclair's plea agreement with the State, the State dismissed his first-degree robbery charge. Sinclair pled guilty to two third-degree offenses, and was sentenced to probation. In defendant's trial, defense counsel sought to cross-examine Sinclair about his plea agreement in order to establish bias. The trial court barred defense counsel from exploring the plea bargain in cross-examination.

The second issue contested in this appeal also arose during the State's case-in-chief. The State called as an expert Dr. Frederick DiCarlo, an assistant medical examiner, as a substitute for Dr. Peacock, who had died prior to defendant's trial. Defendant had not objected prior to trial to the State's plan to call Dr. DiCarlo as a substitute witness. However, during Dr. DiCarlo's testimony, defense counsel objected to what he characterized as the expert's "parroting" of the findings of Dr. Peacock. Although defense counsel did not specifically

12

invoke the Confrontation Clause, he told the trial court that Dr. DiCarlo should be permitted to testify only about his "own independent observations of the autopsy photographs and things of that nature," and that the expert should not testify about the observations of the late Dr. Peacock. The trial court ruled that Dr. DiCarlo was permitted to testify about the opinions expressed by Dr. Peacock in his autopsy report.

The final issue in dispute in this appeal was raised during the charge conference conducted by the trial court. Defense counsel argued that, although defendant initially admitted Shabazz and Sinclair into his motel room, they later became "intruders" in that room, because they were intent on robbing defendant. As such, defense counsel asked the trial court to instruct the jury, in accordance with N.J.S.A. 2C:3-4(c), regarding the use of force that is permissible when an individual is confronted in his or her dwelling by an "intruder." The trial court declined to give that instruction.

The jury convicted defendant of all charges. The trial court sentenced defendant to an aggregate sixty-year term of incarceration.[2]

---

[2] Pursuant to the persistent offender statute, N.J.S.A. 2C:44-3(a), the trial court sentenced defendant to an extended-term of thirty-five years' imprisonment with no parole eligibility on the murder charge. It imposed a term of twenty years' imprisonment for attempted murder, consecutive to his sentence

Defendant appealed his conviction and sentence. The panel rejected the three arguments that defendant asserts before this Court, and affirmed defendant's conviction and sentence.[3] It reasoned that because Sinclair had already been sentenced for his 2008 offense when defendant was tried, the trial court properly barred defendant from cross-examining Sinclair regarding his plea bargain in that matter. The panel held that the trial court properly admitted the expert testimony of the substitute medical examiner, Dr. DiCarlo, because the autopsy report prepared by Dr. Peacock was not sufficiently formalized to be considered "testimonial," and because N.J.R.E. 703 allows expert witnesses to rely on hearsay in their opinions. The panel also held that, based upon the trial record, defendant was

for the murder, subject to an eighty-five percent parole disqualifier under the No Early Release Act, N.J.S.A. 2C:43-7.2. The court also imposed a term of five years' incarceration, to run consecutively with defendant's sentences on the murder and attempted murder charges, for the offense of certain persons not to possess a handgun, and a term of five years' imprisonment, to run concurrently with the other terms of incarceration imposed, with three years of parole ineligibility, for the charge of unlawful possession of a weapon. The remaining charge, for possession of a weapon for an unlawful purpose, was merged into the murder charge.

[3] In the brief prepared by counsel and the pro se brief that he submitted to the Appellate Division, defendant contended that the trial court committed eight other errors. Those alleged errors were not raised before this Court, and we do not address them.

14

not entitled to a jury instruction regarding the use of force against an intruder.

This Court granted defendant's petition for certification. 221 N.J. 284 (2014).

### III.

Defendant argues that the trial court improperly barred his counsel from cross-examining Sinclair about the plea agreement that resolved his 2008 robbery charge.  He maintains that Sinclair's testimony was drawn from pretrial statements that he provided to the State when his first-degree robbery charge was pending.  Defendant asserts that the trial court improperly reasoned that Sinclair would not be motivated by the plea bargain to testify favorably for the State in this case.  He contends that Sinclair's probationary status at the time of trial should have been fully explored.  Defendant argues that the Confrontation Clause broadly protects a defendant's right to raise, in cross-examination, any factor that might motivate the witness to testify favorably for the State.

Defendant also asserts that in his expert testimony regarding the autopsy of Shabazz, Dr. DiCarlo was improperly permitted to read portions of Dr. Peacock's autopsy report to the jury.  He contends that the trial court's ruling on Dr. DiCarlo's testimony conflicts with this Court's decisions in Michaels and Roach because the judgments and opinions of a

15

medical examiner who conducts an autopsy are inherently different from the machine-generated data addressed in those cases.

Finally, defendant insists that he was entitled to a jury instruction on the permissible use of force against an intruder. Defendant reasons that, although he admitted Shabazz and Sinclair to his motel room, they subsequently attempted to rob him, and thereby became "intruders" for purposes of defendant's claim of self-defense.

The State counters that the trial court properly barred defendant from cross-examining Sinclair regarding his 2008 plea agreement. It stresses that when this case proceeded to trial, Sinclair had already pled guilty and had been sentenced to probation. The State asserts that only pending charges or prior related charges, not unrelated charges that have been resolved, may be the subject of a defendant's cross-examination of a witness. The State asserts that Sinclair's credibility was not undermined by his plea agreement, because he testified consistently with sworn statements that he gave shortly after the shooting. It further notes that Sinclair was independently motivated to testify against defendant because he was a victim of the shooting, which claimed the life of his friend, Shabazz.

The State claims that defendant waived his objection to Dr. DiCarlo's expert testimony because he did not assert that

16

objection prior to trial, but only raised a question about the expert's testimony when that testimony was underway. It contends that Dr. DiCarlo testified in a manner that conformed to federal and New Jersey authority applying the Confrontation Clause. The State notes that Dr. DiCarlo did not simply restate the opinions of his deceased predecessor, but offered his own observations regarding the autopsy, and that Dr. Peacock's report is not testimonial. It urges the Court to consider the practical implications of a ruling barring an expert from testifying as a substitute for a medical examiner who dies or becomes incapacitated prior to a homicide trial.

The State contends that the trial court properly concluded that the jury charge addressing the use of force against an intruder was inapplicable to this case. It contends that Shabazz and Sinclair were invited guests to defendant's motel room, and that a guest does not become an "intruder" merely because at some point during the visit, he or she attempts to steal from the host. The State urges the Court to affirm the Appellate Division's determination as to the jury charge.

IV.

A.

1.

The trial court's constraints on defendant's cross-examination of Sinclair implicate defendant's right "to be

17

confronted with the witnesses against him," guaranteed by the Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution. U.S. Const. amend. VI; N.J. Const. art. 1, ¶ 10. The Confrontation Clause permits a defendant to explore, in cross-examination, a prosecution witness's alleged bias. As the United States Supreme Court has observed, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." Delaware v. Van Arsdall, 475 U.S. 673, 678-79, 106 S. Ct. 1431, 1435, 89 L. Ed. 2d 674, 683 (1986) (citations omitted).

In Davis v. Alaska, 415 U.S. 308, 315-17, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347, 353-54 (1974), the Supreme Court addressed a defendant's right under the Confrontation Clause to question a prosecution witness with respect to the witness's prior record and probationary status. There, upholding a state policy against the disclosure of juvenile records, the judge overseeing the defendant's trial for grand larceny and burglary barred defense counsel from asking a juvenile prosecution witness about his adjudication of delinquency and his sentence to a term of probation. Id. at 314, 94 S. Ct. at 1109, 39 L. Ed. 2d at 352-53. The trial court's determination was affirmed on appeal. Ibid. The Supreme Court reversed, holding that the defendant was not only entitled to ask the juvenile whether he

18

was biased in favor of the State, but to demonstrate potential reasons for such bias:  the juvenile's "vulnerable status as a probationer," and his concern that he might be named as a suspect in the current matter.  Id. at 318, 94 S. Ct. at 1111, 39 L. Ed. 2d at 354.  The Supreme Court held that the defendant's rights under the Confrontation Clause had been violated at his trial, and reversed his conviction.

This Court has recognized that the claimed bias of a witness is generally an appropriate inquiry in cross-examination in criminal trials:

> [A]s a general rule, any fact which bears against the credibility of a witness is relevant to the issue being tried, and the party against whom the witness is called has a right to have that fact laid before the jury in order to aid them in determining what credit should be given to the person testifying.  And it is proper for either the defense or the prosecution to show the interest of a witness as bearing upon the witness' credibility. Were it otherwise, the value of cross-examination in the search for truth which goes on in our courts every day would be severely curtailed and in some respects perhaps extinguished altogether.
>
> [State v. Pontery, 19 N.J. 457, 472 (1955) (citations omitted).]

As this Court has observed, "[t]here can be no question that a defendant must be afforded the opportunity through effective cross-examination to show bias on the part of adverse state witnesses."  State v. Sugar, 100 N.J. 214, 230 (1985); see

19

also State v. Parsons, 341 N.J. Super. 448, 458 (App. Div. 2001) (holding that defendant "has a right to explore evidence tending to show that the State may have a 'hold' of some kind over a witness, the mere existence of which might prompt the individual to color his testimony in favor of the prosecution").

Notwithstanding those general principles, a defendant's confrontation rights do not entitle counsel "to roam at will under the guise of impeaching the witness." Pontery, supra, 19 N.J. at 473; see also United States v. Sutherland, 929 F.2d 765 776-77 (1st Cir.) (holding that when defendant presents "no basis for suspecting bias other than a conclusory allegation," trial court may bar cross-examination on claimed bias without violating Confrontation Clause), cert. denied, 502 U.S. 822, 112 S. Ct. 83, 116 L. Ed. 56 (1991). A trial judge may bar inquiry into a witness's potential bias, without offending the Confrontation Clause, because of concerns about "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, supra, 475 U.S. at 679, 106 S. Ct. at 1435, 89 L. Ed. 2d at 683. The trial court is charged to evaluate whether the circumstances fairly support an inference of bias, and to consider any concerns raised by the proposed inquiry.

A defendant's claim that there is an inference of bias is particularly compelling when the witness is under investigation,

20

or charges are pending against the witness, at the time that he or she testifies.  As this Court observed, in reversing a conviction after the trial court barred the defendant from asking a prosecution witness about her unresolved drug charge,

> [h]ad it been disclosed that the prosecutor had recommended, and [the witness] had received, favorable treatment in the form of a conditional dismissal of a criminal charge against her, and that at the time she testified as a State's witness she was still in the process of achieving a complete dismissal of such charge, defendant could have attacked her credibility by suggesting a possible motive for her testimony.
>
> [State v. Spano, 69 N.J. 231, 235 (1976).]

Indeed, "[i]n an unbroken line of decisions, our courts have held that the pendency of charges or an investigation relating to a prosecution witness is an appropriate topic for cross-examination."  State v. Landano, 271 N.J. Super. 1, 40 (App. Div.), certif. denied, 137 N.J. 164 (1994); see, e.g., State v. Rodriguez, 262 N.J. Super. 564, 570 (App. Div. 1993) ("It is clear that if the State had called [the witness to testify] against defendant, defendant would have been entitled to cross-examine him about his expectations with respect to the charge pending against him. . . . [S]entencing possibilities would have been highly relevant to the witness's motive in testifying insofar as it bore upon his credibility."); State v. Baker, 133 N.J. Super. 394, 396 (App. Div. 1975) (noting that

21

defendant may explore possibility "that in return for [a prosecution witness's] testimony he had received a promise of lenient treatment on the indictments then pending against him or, on the other hand, was apprehensive of more stringent treatment thereon if he did not so testify").

Nonetheless, a charge need not be pending at the time of trial to support an inference of bias. In a given case, a charge against a witness that has been resolved by dismissal or sentencing before the witness testifies may be an appropriate subject for cross-examination. Indeed, at the time of both the alleged offense and the trial in Davis, the witness was already "on probation by order of a juvenile court after having been adjudicated a delinquent for burglarizing two cabins." Davis, supra, 415 U.S. at 311, 94 S. Ct. at 1107, 39 L. Ed. 2d at 350. The Supreme Court reasoned that the witness may have been subject to pressure when he identified the defendant as the perpetrator, and later when he testified, by virtue of his "vulnerable status as a probationer, as well as [his] possible concern that he might be a suspect in the investigation." Id. at 318, 94 S. Ct. at 1111, 39 L. Ed. 2d at 354. In State v. Mazur, 158 N.J. Super. 89, 104 (App. Div.), certif. denied, 78 N.J. 399 (1978), the Appellate Division permitted a defendant to cross-examine a witness regarding an offense as to which the witness was under investigation, but not yet charged, holding

22

that "defendant should not be restricted in demonstrating the possible bias of a prosecution witness to circumstances wherein the witness has criminal charges pending against him[.]" Ibid.

Moreover, a charge against a prosecution witness that is unrelated to the current charge against the defendant may be an appropriate topic for cross-examination. See Davis, supra, 415 U.S. at 317-18, 94 S. Ct. at 1111, 39 L. Ed. 2d at 354-55 (holding juvenile witness could be questioned about status of charges arising from burglary unrelated to burglary for which defendant was charged); Spano, supra, 69 N.J. at 234-35 (allowing cross-examination of prosecution witness regarding previous unrelated drug charges); State v. Curcio, 23 N.J. 521, 526-27 (1957) (permitting defense inquiry about prosecution witness's unrelated federal indictment). Because unrelated charges can give rise to a motive to cooperate, they are directly pertinent to the question of a witness's bias.

In sum, the case law envisions that a trial court will undertake a careful evaluation of a defendant's claim that a witness is biased.[4] The nature of the witness's alleged offense,

---

[4] If a dispute over the appropriate scope of inquiry warrants the development of a factual record, the court may hold a preliminary hearing pursuant to N.J.R.E. 104(a). See, e.g., State v. Chen, 208 N.J. 307, 327-28 (2011) (assessing whether out-of-court witness identifications are sufficiently reliable); State v. P.S., 202 N.J. 232, 248-49 (2010) (gauging credibility of child's out-of-court statement in sexual assault case); State

and the sentencing exposure that he or she confronts by virtue of that offense, is a significant factor. If a witness faces a pending investigation or unresolved charges when he or she gives a statement to law enforcement, cooperates with the prosecution in preparation for trial, or testifies on the State's behalf, that investigation or charge is an appropriate subject for cross-examination. The trial court should also review the terms of the witness's plea agreement.

2.

Consistent with the principles stated in the case law, we consider whether the trial court erred when it barred defendant from exploring the terms of the plea bargain that led to the dismissal of Sinclair's unrelated first-degree robbery charge and probationary sentence.

The record on appeal reveals few details about the January 20, 2008 offense for which Sinclair was charged. Before the trial court in this case, defense counsel characterized the offense as a "home invasion/robbery of a residence;" the State countered that the offense was the robbery of a "drug dealer", after which the defendants split the proceeds. Although Sinclair insisted in his trial testimony that his role in the

---

v. Burr, 392 N.J. Super. 538, 551-55 (App. Div. 2007) (exploring permissible scope of expert testimony), aff'd as modified, 195 N.J. 119 (2008).

incident had been "minor," the county prosecutor's office that prosecuted defendant in this case charged Sinclair with first-degree robbery, as well as weapons offenses that are not identified in the record. Charged with a first-degree offense, and eligible for an extended term by virtue of his prior criminal record, Sinclair faced significant sentencing exposure. If convicted of first-degree robbery, he could have been sentenced to a life term. See N.J.S.A. 2C:15-1(b) (defining armed robberies as first-degree offenses); N.J.S.A. 2C:43-6(a)(1) (setting base sentences for first-degree crimes at ten to twenty years); N.J.S.A. 2C:44-3(a) (rendering persistent offenders eligible for extended sentences); N.J.S.A. 2C:43-7(a)(2) ("[I]n the case of a crime of the first degree, [the court shall impose] a specific term of years which shall be fixed by the court and shall be between 20 years and life imprisonment.").

On a date that is not specified in the record, the State and Sinclair entered into a plea agreement. The terms of that agreement were very favorable to Sinclair.[5] On October 9, 2008,

---

[5] The record in this appeal does not include the transcript of Sinclair's plea hearing or sentencing hearing from his 2008 guilty plea. Our description of the terms of his plea agreement is based on the statements of counsel to the trial court during argument regarding the scope of defendant's cross-examination of Sinclair, and the parties' briefs. The record does not disclose what facts Sinclair admitted as the basis for his guilty plea or

pursuant to that agreement, Sinclair pled guilty to two offenses:  third-degree theft and third-degree burglary.  The State dismissed the first-degree robbery and weapons charges pending against him.  Sinclair agreed to testify, if needed, against his codefendants in that case.  The plea agreement did not reference defendant's upcoming trial.  On March 13, 2009, Sinclair was sentenced to five years' probation and ordered to undergo in-patient drug treatment.  When he testified in defendant's trial nine months later, Sinclair was serving the first year of his probationary sentence.

In a hearing outside the jury's presence during the State's case-in-chief at defendant's trial, the trial court discussed with counsel the scope of defendant's cross-examination of Sinclair with respect to his criminal history.  The parties agreed that defendant should be permitted to cross-examine Sinclair regarding his prior convictions for various offenses.  They disputed, however, defendant's right to cross-examine Sinclair regarding his 2008 plea agreement.  The trial court barred defendant from cross-examining Sinclair "with regard to the plea itself."  The court reasoned that Sinclair's plea bargain was based in part on his agreement to testify against his codefendants in the alleged robbery, but that he had not

---

indicate whether the State recommended the sentence of probation to the sentencing judge.

26

agreed, as part of that plea agreement, to testify against defendant in this matter. The trial court limited defendant's cross-examination regarding Sinclair's 2008 offense to the fact that he had pled guilty to charges of theft and burglary and was on probation.

The pendency of a first-degree charge may have served as a powerful incentive for Sinclair to cooperate with the State as it prepared for defendant's trial. The jury should have been informed that, after the shooting at issue in this case, Sinclair allegedly committed an offense that exposed him to a lengthy term of incarceration. The jury should have been made aware that Sinclair entered into a plea bargain with the State, as the State prepared for defendant's trial, and that by virtue of his plea bargain Sinclair faced probation rather than a lengthy prison term. Defendant was entitled to explore that history in the cross-examination of Sinclair. The trial court erred when it barred his counsel from pursuing this line of questioning.

### 3.

Our determination that the trial court's limitation of defendant's cross-examination of Sinclair constituted error does not end the inquiry. We must also decide whether the trial court's error was "harmless beyond a reasonable doubt." Van Arsdall, supra, 475 U.S. 684, 106 S. Ct. at 1438, 89 L. Ed. 2d

27

at 686.  This Court will disregard "[a]ny error or omission [by the trial court] . . . unless it is of such a nature as to have been clearly capable of producing an unjust result."  State v. Castagna, 187 N.J. 293, 312 (2006) (alterations in original) (citing R. 2:10-2).  The possibility that the error led to an unjust result "'must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached.'"  State v. Lazo, 209 N.J. 9, 26 (2012) (alteration in original) (quoting State v. R.B., 308, 330 (2005)).

In determining whether the trial court's limitation of defense counsel's cross-examination constituted harmless error, we consider the importance of Sinclair's testimony in the broader context of defendant's trial.  When it weighed the charges of first-degree murder and first-degree attempted murder, the jury was compelled to decide whether the State met its burden to prove that defendant purposely or knowingly killed Shabazz and attempted to kill Sinclair.  In that regard, the State was required to disprove, beyond a reasonable doubt, that defendant did not commit his acts "in the heat of passion resulting from a reasonable provocation;" had the State failed to do so, defendant would have been acquitted of first-degree murder and attempted murder.  N.J.S.A. 2C:11-4(b)(2); N.J.S.A. 2C:5-1.  The jury was also charged with respect to the lesser-

28

included offense of aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), which required proof beyond a reasonable doubt that defendant recklessly caused Shabazz's death "under circumstances manifesting extreme indifference to human life," and reckless manslaughter, N.J.S.A. 2C:11-4(b)(1), which required proof beyond a reasonable doubt that defendant acted recklessly when he killed Shabazz. In short, the circumstances that led to the shooting, and defendant's state of mind, were central to the jury's determination.

In addition, by asserting the justification of self-defense, defendant placed the events immediately before the shooting squarely before the jury. Subject to certain limitations set forth in our self-defense statute, a person is justified in using force when he or she "reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." N.J.S.A. 2C:3-4(a). "The use of deadly force is not justifiable . . . unless the actor reasonably believes that such force is necessary to protect himself against death or serious bodily harm[.]" N.J.S.A. 2C:3-4(b)(2); see also State v. Urbina, 221 N.J. 509, 525 (2015). Thus, in order to determine whether defendant was entitled to the justification of self-defense, the jury

necessarily focused on the circumstances that defendant confronted just before the shooting occurred.[6]

Within that legal framework, the parties presented competing narratives. The State asserted that, although Shabazz and Sinclair may have taken money from defendant, and Shabazz harangued him to pay her more, neither of them assaulted defendant or threatened him with death or serious harm. It contended that, as the dispute between Shabazz and defendant escalated in the close quarters of the motel room, defendant abruptly pulled out a gun and began shooting, striking Shabazz and Sinclair as they attempted to escape. In pretrial statements admitted into evidence through the arguments of his counsel, defendant presented a contrasting account of the critical few minutes. He claimed that Shabazz and Sinclair intended to assault and rob him, and that both became violent immediately before the shooting. Defendant asserted that Sinclair attacked him, grabbed him by the throat and pushed him against the wall, and that Shabazz attempted to wrest his gun

---

[6] Although our Code does not recognize the concept of "imperfect self-defense" -- the defendant's subjective, yet unreasonable, belief that his or her safety is endangered -- "evidence of facts sufficient to establish 'imperfect self-defense' may in certain cases 'bear directly on the question of whether the homicide was knowing or purposeful, and would be admissible to counter these essential elements of the offense of murder.'" State v. Pitts, 116 N.J. 580, 605 (1989) (quoting State v. Bowens, 108 N.J. 622, 632 (1987)).

30

away from him.  Defendant argued, in short, that when he shot Shabazz and Sinclair, he reasonably feared that they would seriously injure or kill him.

The State supported its narrative with extensive fact and expert testimony.  Johnson recounted the events of the night, until the time of her departure from the motel room prior to the shooting.  A State Police forensic scientist testified that no gunshot residue was found on Shabazz's clothing, and a ballistics expert opined that the absence of gunshot residue indicates that Shabazz was seven or more feet from defendant when she was shot.  Investigating officers told the jury that no bullet holes or shell casings were found in the motel room, that two bullet strikes were found on the ground outside, fifteen feet from the glass door of the room, and that a trail of blood drops began fifty feet from the door and ended at Shabazz's body, 139 feet from the motel room.  The State presented the medical examiner's conclusion that Shabazz was shot in the lower back while running from defendant, and that she continued to run until she collapsed on the ground near the motel.

Thus, the State's evidence buttressed its contention that defendant shot Shabazz and Sinclair as they were attempting to flee his motel room through the sliding glass door that led outside.  That evidence, however, did not directly address the crucial inquiry for the jury as it weighed charges of murder,

31

attempted murder and manslaughter and considered the issue of self-defense: the events that occurred in the motel room in the moments leading up to the shooting, when only defendant, Shabazz and Sinclair were present. The State called only one witness who was in a position to describe those events. That witness was Sinclair.

The State acknowledged Sinclair's criminal convictions, his involvement with drugs, and his unexplained possession of defendant's billfold after the shooting. It admitted that Sinclair made poor lifestyle choices. Nonetheless, the State portrayed Sinclair as calm and levelheaded, present in defendant's chaotic motel room only to sell drugs to defendant and protect Shabazz. The State urged the jury to believe Sinclair's account and to reject that of defendant. In short, the State substantially premised its case on the jury's acceptance of Sinclair as a credible witness.

Had the jury been aware that, after the shooting in this case, Sinclair was charged with a separate armed robbery and faced exposure to more than a life sentence, and that he and the State entered into a plea agreement that reduced his first-degree offense to third-degree charges with a term of probation, it may well have drawn an inference of bias. That revelation could have affected Sinclair's credibility as the State's key witness, and altered the outcome of defendant's trial. In that

setting, we cannot conclude beyond a reasonable doubt that the trial court's constraints on defendant's cross-examination of Sinclair constituted harmless error.

Accordingly, the trial court's error regarding defendant's cross-examination of Sinclair requires reversal of defendant's conviction for knowing or purposeful murder and attempted murder. Defendant is entitled to a new trial on those charges.

B.

1.

We next consider defendant's challenge to the trial court's admission of the expert testimony of Dr. DiCarlo, the medical examiner called by the State to testify about the autopsy of Shabazz, as a substitute for the deceased Dr. Peacock.

As a threshold matter, we reject the State's argument that defendant waived his Confrontation Clause objection to the testimony of Dr. DiCarlo because he did not assert that objection prior to trial. We recently noted that Confrontation Clause objections "are best addressed before trial to avoid surprise or unfairness." State v. Williams, 219 N.J. 89, 102 (2014), cert. denied, ___ U.S. ___, 135 S. Ct. 1357, 191 L. Ed. 565 (2015). Nonetheless, a defendant does not waive a Confrontation Clause objection to a witness's testimony by waiting until that testimony is underway, particularly where, as here, the objection is premised on the form and content of the

witness's testimony.  Because defense counsel promptly objected when Dr. DiCarlo read portions of Dr. Peacock's report to the jury, defendant preserved his Confrontation Clause objection. See id. at 101.  Defense counsel may have known that Dr. DiCarlo would testify, but could not know Dr. DiCarlo would read from the late Dr. Peacock's report.  Therefore, the objection was timely at the time Dr. DiCarlo testified.  Moreover, although defendant did not specifically invoke the Confrontation Clause, his right of confrontation was clearly the foundation for his objection.

Defendant's trial took place during a period of transition in the law governing the admission of out-of-court statements on forensic issues.  Prior to 2004, the United States Supreme Court authorized admission of an unavailable witness's out-of-court statement if the statement was "within a firmly rooted hearsay exception" and the court found "particularized guarantees of trustworthiness."  Ohio v. Roberts, 448 U.S. 56, 66, 100 S. Ct. 2531, 2539, 65 L. Ed. 2d 597, 608 (1980).  In 2004, the Supreme Court rejected that standard in Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).  The Court held that if a statement is "testimonial," the Confrontation Clause "demands what the common law required: unavailability [of the declarant] and a prior opportunity for cross-examination."  Id. at 68, 124 S. Ct. at 1374, 158 L. Ed. 2d at 203.

34

Between 2009 and 2012, the Supreme Court decided a trilogy of cases applying Crawford to the admissibility of a forensic report when the analyst who prepared that report is unavailable to testify in a criminal trial.  Williams v. Illinois, 567 U.S. ___, 132 S. Ct. 2221, 183 L. Ed. 2d 89, 124 (2012); Bullcoming v. New Mexico, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011); Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009).  These splintered decisions, revealing deep disagreements among the Justices, left the law in this important area in an uncertain state.

In 2014, after the Appellate Division's decision in this case, the Supreme Court's opinions in Melendez-Diaz, Bullcoming and Williams were comprehensively analyzed in Justice LaVecchia's opinions in Michaels, supra, 219 N.J. at 18-32, and Roach, supra, 219 N.J. at 74-80.[7]  In Michaels, supra, this Court considered the admissibility of the results of testing conducted on a blood sample taken from the defendant after she was involved in a motor vehicle accident that killed a passenger in another car.  219 N.J. at 7-8.  The test results demonstrated the presence in the defendant's blood of cocaine, a cocaine

---

[7] The New Jersey Constitution's Confrontation Clause is coextensive with its federal counterpart with respect to this issue, and our "case law traditionally has relied on federal case law to ensure that the two provisions provide equivalent protection."  Roach, supra, 219 N.J. at 74.

metabolite and the active ingredient of Xanax, a prescription antianxiety medicine. Id. at 9. Those results were obtained through a computer screening process involving fourteen different analysts employed by a private laboratory. Id. at 8-9.

An expert forensic toxicologist and pharmacologist, who had supervisory responsibilities at the laboratory but personally played no role in the testing conducted on defendant's blood sample, reviewed the data generated by the laboratory's computer. Id. at 9. On the basis of that review, the expert determined that the testing had been conducted in accordance with standard operating procedures, and that the results were correct. Id. at 9, 11. Over the defendant's Confrontation Clause objection, the expert was permitted to testify about the test results, and to opine that the defendant was impaired by drugs at the time of the accident. Id. at 11. The defendant was convicted, and the Appellate Division affirmed her conviction. Id. at 11-12.

This Court reaffirmed its adherence to the "primary purpose" test for determining whether a statement is testimonial, notwithstanding the suggestion in two of the separate concurring opinions in the United States Supreme Court's decision in Williams, that the Supreme Court may reject that test. Id. at 31. A statement is "testimonial" if its

36

"'primary purpose' [is] 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.'" Bullcoming, supra, 564 U.S. at ___ n.6, 131 S. Ct. at 2714 n.6, 180 L. Ed. 2d at 620 n.6 (quoting Davis v. Washington, 547 U.S. 813, 822, 126 S. Ct. 2266, 2274, 165 L. Ed. 2d 224, 237 (2006)).

In Michaels, this Court held that because the United States Supreme Court's fractured decision in Williams reflects no consensus among the Justices, it provides sparse guidance on the Confrontation Clause's impact on the admission of forensic statements in criminal trials. Michaels, supra, 219 N.J. at 31-32. Accordingly, this Court primarily relied on the Supreme Court's earlier decisions in Melendez-Diaz and Bullcoming. See id. at 31-36. It noted that in Melendez-Diaz, "no witness was offered to support and be cross-examined in respect of the statements contained in the forensic document that was admitted into evidence without live testimony." Id. at 32 (citing Melendez-Diaz, supra, 557 U.S. at 308-09; 129 S. Ct. at 2531, 174 L. Ed. 2d at 320). It further observed that in Bullcoming, the Supreme Court held that a forensic report could not be admitted through the testimony of an analyst who was a co-worker of the analyst who performed the laboratory testing. Ibid. (citing Bullcoming, supra, 564 U.S. at ___, 131 S. Ct. at 2709-10, 180 L. Ed. 2d at 616). There, the trial witness was not the

37

analyst's supervisor, and did not observe or assist in the testing conducted.  Ibid.

This Court noted further in Michaels that state courts have adopted divergent interpretations of the unsettled United States Supreme Court Confrontation Clause jurisprudence.  Id. at 46-49; see also Roach, supra, 219 N.J. at 78-80 (same).  Nonetheless, the Court derived two governing principles from the United States Supreme Court's opinions.  First, this Court concluded that neither Melendez-Diaz nor Bullcoming "require[] that every analyst involved in a testing process must testify in order to admit a forensic report into evidence and satisfy confrontation rights."  Michaels, supra, 219 N.J. at 33.  Second, it concluded that neither United States Supreme Court decision requires "that in every case, no matter the type of testing involved or the type of review conducted by the person who does testify, the primary analyst involved in the original testing must testify to avoid a Confrontation Clause violation."  Ibid.  As the majority explained in Michaels,

> we believe that a truly independent reviewer or supervisor of testing results can testify to those results and to his or her conclusions about those results, without violating a defendant's confrontation rights, if the testifying witness is knowledgeable about the testing process, has independently verified the correctness of the machine-tested processes and results, and has formed an independent conclusion about the results.

38

[Id. at 45-46.]

Applying those Confrontation Clause principles, the Court held that the State's expert was properly permitted to testify at the defendant's trial in Michaels, because "he testified to the findings and conclusions that he reached based on test processes that he independently reviewed and verified." Id. at 46.

In Roach, the Court applied the standard set forth in Michaels to the admission of the expert testimony of an analyst regarding the DNA profile that linked the defendant to a sexual assault. Roach, supra, 219 N.J. at 64-65. At the time of trial, the State Police forensic scientist who had generated the defendant's DNA profile had relocated to another state. Id. at 64. A forensic scientist who had been a co-worker of the original analyst reviewed that analyst's report and the data generated by that analyst's testing procedures, verified the prior analyst's conclusions, and prepared a report that compared the defendant's DNA profile to the profile prepared based on a sample taken from the victim. Id. at 64-65. The trial court overruled the defendant's objection to the admission of the forensic scientist's opinion. Id. at 66. The defendant was convicted, and his conviction was affirmed by the Appellate Division. Id. at 69.

In Roach, this Court noted that although the facts did not involve the admission of an absent analyst's report into evidence, the report was "integral" to the forensic scientist's testimony because she was asked, in her direct examination, whether she agreed with that report. Id. at 76-77. The Court explained that a co-worker could testify as to the results of testing conducted by an analyst who does not appear at trial, provided that the testifying witness is "a truly independent and qualified reviewer of the underlying data and report," and the witness does not "merely parrot the findings of another." Id. at 79-80. The Court concluded that in the defendant's trial, the testifying witness "explained how she used her scientific expertise and knowledge to independently review and analyze the graphic raw data that was the computer-generated product" of the testing conducted by the analyst who was unavailable to appear at trial. Id. at 81. It accordingly held that the admission of the analyst's testimony did not violate the defendant's confrontation rights. Id. at 83.

2.

Although the conduct of an autopsy is distinct from the evaluation of machine-generated data such as the testing results at issue in Michaels and Roach, the principles stated in those cases apply in this setting.

40

Under the analysis set forth in Michaels and Roach, we first determine whether Dr. Peacock's autopsy report is testimonial for purposes of the Confrontation Clause under the "primary purpose" test. We conclude that the report is testimonial. When Dr. Peacock conducted the autopsy of Shabazz at 10:40 a.m. on December 20, 2006, six hours after the shooting, the county prosecutor's office and local law enforcement were engaged in an active homicide investigation.[8] Defendant was a suspect; although he had yet to admit his involvement in the shooting to police, he had spoken to officers and had been taken to the police station. The autopsy was conducted in the presence of two law enforcement officers, one of whom was the lead investigator for the county prosecutor. Fingerprints and other evidence collected by the medical examiner were transmitted to that investigator, and the chain of custody from medical examiner to law enforcement was recorded in the report. Thus, the primary purpose of the autopsy was to

---

[8] N.J.S.A. 52:17B-88 envisions close cooperation between a medical examiner and law enforcement in a homicide case; the statute requires that the medical examiner communicate the results of an autopsy to the county prosecutor, and allows a county prosecutor to require that the medical examiner perform an autopsy in certain cases. N.J.S.A. 52:17B-88. "In cases of suspected criminal homicide, the medical examiner shall coordinate with the county prosecutor or Attorney General" before the examiner removes the body from the scene of the crime. N.J.A.C. 13:49-5.1.

41

establish facts for later use in the prosecution of this case. Dr. Peacock's autopsy report is therefore testimonial.[9]

In defendant's trial, the State did not offer Dr. Peacock's autopsy report into evidence. Nonetheless, a testimonial report that is not admitted into evidence can engender a violation of the Confrontation Clause if that report is "integral" to the testimony of a substitute witness. Roach, supra, 219 N.J. at 76-77. Thus, Dr. DiCarlo's reliance on Dr. Peacock's report is an important consideration.

In preparation for his testimony, Dr. DiCarlo read Dr. Peacock's autopsy report, reviewed the autopsy photographs, inspected the crime scene and examined the clothing that Shabazz wore when she died. Despite his thorough review of the case, Dr. DiCarlo did not prepare a written report setting forth his observations, findings and conclusions regarding the autopsy of

---

[9] We do not reach the broader issue of whether autopsy reports, in general, are testimonial for purposes of the Confrontation Clause. The "primary purpose" test envisions a fact-specific analysis of the autopsy report at issue here, and our determination is based on the circumstances presented by this case. See United States v. James, 712 F.3d 79, 95-96 (2d Cir. 2013) (noting that the pre-Williams case law compels evaluation of circumstances under which analysis was prepared to determine primary purpose), cert. denied, ___ U.S. ___, 134 S. Ct. 2660, 189 L. Ed. 2d (2014); State v. Hutchison, ___ S.W.3d ___, ___ n.6. 2016 Tenn. LEXIS 83, at *44 n.6 (Tenn. 2016) (noting that "[n]ot all autopsies are done for the purpose of establishing a fact for eventual criminal prosecution[,]" and that the "totality of the circumstances" should be considered in determination of primary purpose).

Shabazz. He wrote only a one-sentence letter to the prosecutor, stating "I have reviewed the postmortem examination and autopsy report of [Shabazz] prepared by Dr. Jay A. Peacock, M.D. and I agree with his findings as well as his interpretations regarding the cause and manner of death."

At defendant's trial, instead of limiting its examination of Dr. DiCarlo to his independent observations and analysis regarding Shabazz's condition and cause of death, the State prompted its expert to read the contents of various portions of Dr. Peacock's autopsy report, as if Dr. DiCarlo had been present at the autopsy and Dr. Peacock's findings were his own. Defense counsel objected, arguing that the witness should not be "parroting what was in Dr. Peacock's report as if these were his findings." He asked the trial court to limit Dr. DiCarlo to "his own independent observations of the autopsy photographs and things of that nature."

The trial court overruled the defense objection. It advised the State to place Dr. Peacock's conclusions on the record, and to ask Dr. DiCarlo whether he agreed with them. Although Dr. DiCarlo was asked to generally comment on autopsy techniques based on his own expertise and experience, and offered independent observations and conclusions on several autopsy photographs, he devoted much of his testimony to reading portions of Dr. Peacock's report. On the issue of the cause of

death, Dr. DiCarlo presented Dr. Peacock's opinion that Shabazz died from a "single perforating gunshot wound to the torso with entrance to the right back and involvement of the heart," and that the pattern of blood droplets indicated that Shabazz bled "as she [was] running away, and then she collapse[d]." Dr. DiCarlo then stated that he agreed with Dr. Peacock's conclusion.

Thus, Dr. DiCarlo was permitted to engage in precisely the type of "parroting" of the autopsy report that has been held to violate the Confrontation Clause. Michaels, supra, 219 N.J. at 46; Roach, supra, 219 N.J. at 79-80; see Bullcoming, supra, 564 U.S. at ___, 131 S. Ct. at 2715-16, 180 L. Ed. 2d at 622. Most of Dr. DiCarlo's testimony consisted of his recitation of Dr. Peacock's report as he answered the State's questions. In contrast to the independent opinions offered by the forensic analysts in Michaels and Roach, Dr. DiCarlo simply repeated to the jury the impressions and conclusions recorded by Dr. Peacock. Dr. DiCarlo's testimony did not conform to the Confrontation Clause, and the trial court committed error when it admitted that testimony.

Notwithstanding the death of Dr. Peacock, the State was in a position to present the testimony of Dr. DiCarlo in a manner that did not offend the Confrontation Clause. As the trial court recognized, Dr. DiCarlo is a qualified forensic

pathologist. He personally reviewed the autopsy photographs, the clothing worn by Shabazz, and the crime scene. By virtue of his analysis, Dr. DiCarlo could have testified as an independent reviewer of the information generated by the autopsy, as this Court contemplated in Michaels, supra, 219 N.J. at 45-46, and Roach, supra, 219 N.J. at 79. Although some of Dr. Peacock's observations could not be replicated three years after the fact, Dr. DiCarlo could have prepared his own report, based on his own findings, without "parroting" Dr. Peacock's observations. He could have provided valuable expert testimony to the jury, entirely on the basis of his own review of the evidence. If properly conducted, the direct examination of a substitute medical examiner about an autopsy may provide the independent "verification of the data and results" that this Court contemplated in Michaels and Roach. Roach, supra, 219 N.J. at 80; accord Michaels, supra, 219 N.J. at 45-46.

We recognize that homicide investigations may take years to complete, and that the State unavoidably faces situations in which a medical examiner who conducted an autopsy dies, becomes incapacitated or relocates out of state before trial. We urge prosecutors to anticipate the need to present a substitute witness should such circumstances arise and to take appropriate

measures.[10]  With careful planning, the State can ensure that, in the event that a medical examiner is unavailable to testify about the autopsy that he or she conducted, an alternative expert witness will be in a position to undertake the independent review and analysis that this Court envisioned in Michaels and Roach.

Because we reverse defendant's conviction on other grounds, we need not determine whether the trial court's error in admitting the testimony of Dr. DiCarlo was harmless.[11]  See State v. Thomas, 76 N.J. 344, 366 (1978) ("[W]e need not reach that issue since we have already concluded that reversal is in order on a different ground.").  On retrial, any expert testimony presented by the State regarding the autopsy of Shabazz should conform with the requirements set forth in this opinion.

C.

---

[10] For example, a second medical examiner could attend the autopsy of a homicide victim, and testify if necessary. Autopsies may be comprehensively recorded by photography or videotape.  Wound dimensions and similar data may be documented in a manner that may be independently verified.  Clothing, DNA samples, toxicology and other evidence obtained at the autopsy can be retained for later analysis.  If a surrogate witness must be called, that witness should record his or her observations, findings and analysis in a report.

[11] We note that the State presented, through the testimony of police investigators who had examined Shabazz's body at the scene of the shooting, some of the information that Dr. DiCarlo provided in his testimony about Dr. Peacock's autopsy report.

The final issue raised in this appeal is whether the trial court properly declined defendant's request to instruct the jury about the use of force that may be used against an intruder. A trial court must charge the jury on an affirmative defense if there is a rational basis in the evidence for the charge. State v. Singleton, 211 N.J. 157, 183 (2012). Accordingly, we consider whether the evidence in this case provided a rational basis for the charge sought by defendant.

The jury charge requested by defendant in this case is premised on N.J.S.A. 2C:3-4(c). That statute addresses the circumstances under which deadly force may be used "upon or toward an intruder who is unlawfully in a dwelling[.]" N.J.S.A. 2C:3-4(c)(1). Such force is justifiable when the person who uses that force reasonably believes it to be "immediately necessary for the purpose of protecting himself or other persons in the dwelling against the use of unlawful force by the intruder on the present occasion." Ibid. The Legislature defined a "reasonable belief" as follows:

> (2) A reasonable belief exists when the actor, to protect himself or a third person, was in his own dwelling at the time of the offense or was privileged to be thereon and the encounter between the actor and intruder was sudden and unexpected, compelling the actor to act instantly and:
>
> (a) The actor reasonably believed that the intruder would inflict personal

47

injury upon the actor or others in the
dwelling; or

(b)  The actor demanded that the intruder
disarm, surrender or withdraw, and the
intruder refused to do so.

[N.J.S.A. 2C:3-4(c)(2).]

If the statute applies, the person using force against an

intruder "may estimate the necessity of using force when the

force is used, without retreating, surrendering possession,

withdrawing or doing any other act which he has no legal duty to

do or abstaining from any lawful action."  N.J.S.A. 2C:3-

4(c)(3).

The "intruder" charge under N.J.S.A. 2C:3-4(c) is distinct

from the self-defense instruction that the trial court properly

gave in this case, in accordance with N.J.S.A. 2C:3-4(a).  Under

the self-defense provision of the Code, "[t]he use of deadly

force is not justifiable . . . unless the actor reasonably

believes that such force is necessary to protect himself against

death or serious bodily harm."  N.J.S.A. 2C:3-4(b)(2).  In

contrast, the "intruder" provision of the Code requires the

individual who uses force to have a reasonable belief that the

intruder "would inflict personal injury" upon that individual or

others in his or her dwelling.  N.J.S.A. 2C:3-4(c)(2)(a).

The Legislature did not define the term "intruder."

Therefore, we must discern the Legislature's intended meaning

when it used the term "intruder" in N.J.S.A. 2C:3-4(c).  In that determination, "the goal is to divine and effectuate the Legislature's intent."  State v. Shelley, 205 N.J. 320, 323 (2011).  "To accomplish that end, we adhere to the belief that 'the best indicator of . . . [legislative] intent is the plain language chosen by the Legislature.'"  State v. Hudson, 209 N.J. 513, 529 (2012) (alternation in original) (quoting State v. Gandhi, 201 N.J. 161, 176 (2010)).  We give the Legislature's chosen terms "their ordinary and accepted meaning."  Shelley, supra, 205 N.J. at 323.

Although this Court has not previously interpreted the term "intruder" in N.J.S.A. 2C:3-4(c), the Appellate Division has suggested in two cases that an individual who is admitted to a dwelling by the occupant of that dwelling, and then is involved in a dispute with the occupant, is not an "intruder" under N.J.S.A. 2C:3-4(c).  See State v. Bilek, 308 N.J. Super. 1, 13 (App. Div. 1998) (holding that trial court should have given intruder charge in trial of defendant who confronted "uninvited" individual in his apartment); State v. Felton, 180 N.J. Super. 361, 365 (App. Div. 1981) (noting evidence supported finding that former boyfriend admitted to defendant's apartment "entered [the apartment] lawfully and was not an intruder," although an altercation occurred during visit).  We concur with the distinction recognized by the Appellate Division in those

49

decisions.  For purposes of N.J.S.A. 2C:3-4(c), we construe the term "intruder" to denote an individual who enters, or attempts to enter, a dwelling uninvited.  That term does not extend to an individual who is invited into a dwelling by the resident, and is a guest in that dwelling for a period of time before the use of force occurs.[12]

In this case, the trial court properly declined to give the N.J.S.A. 2C:3-4(c) "intruder" charge because the evidence presented at trial clearly established that defendant invited Shabazz and Sinclair into his motel room.  According to the testimony of Johnson, defendant encouraged Johnson to bring a "friend" to his motel room.  Defendant freely admitted Shabazz into his room when she and Johnson arrived.  Even when Shabazz returned to the motel room accompanied by Sinclair, defendant opened the door and allowed them into the room.  Moreover, according to Johnson, when Johnson later demanded that Shabazz and Sinclair leave, defendant urged them to stay.  Neither Shabazz nor Sinclair was an "intruder" within the meaning of N.J.S.A. 2C:3-4(c).

The Appellate Division properly held that defendant was not entitled to a jury instruction addressing the use of force

---

[12] We do not reach the question whether a person who secures an invitation into a dwelling by misrepresenting his or her identity or purpose, and then commits or threatens to commit an unlawful act, may be an "intruder" under N.J.S.A. 2C:3-4(c).

against an intruder.  We affirm the Appellate Division's judgment with respect to that issue.

V.

The judgment of the Appellate Division is affirmed in part and reversed in part.  We vacate defendant's convictions for murder, attempted murder and the possession of a weapon for an unlawful purpose, and remand for a new trial on those charges.[13]

CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion.  JUSTICE FERNANDEZ-VINA did not participate.

---

[13] Defendant's convictions for the unlawful possession of a weapon, and certain persons not to have a weapon, are not affected by our decision.

SUPREME COURT OF NEW JERSEY

NO. ___A-118___                    SEPTEMBER TERM 2013

ON CERTIFICATION TO _____Appellate Division, Superior Court_____


STATE OF NEW JERSEY,

Plaintiff-Respondent,

v.

DAVID BASS (a/k/a ROBERT HINES),

Defendant-Appellant.



DECIDED _____March 7, 2016_____
              Chief Justice Rabner              PRESIDING
_____
OPINION BY _____Justice Patterson_____
CONCURRING/DISSENTING OPINIONS BY _____
DISSENTING OPINION BY _____

| CHECKLIST | AFFIRMED/ REVERSED/ REMANDED | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | -------------------- | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 6 | |