NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2496-16T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ZIA BERISHA,

    Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **February 7, 2019** |
| **APPELLATE DIVISION** |

Argued December 18, 2018 – Decided February 7, 2019

Before Judges Fisher, Geiger and Firko.[1]

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 09-09-1595.

Alan Dexter Bowman argued the cause for appellant.

Svjetlana Tesic, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County Prosecutor, attorney; Svjetlana Tesic, on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

---

[1] The matter was originally argued to a two-judge panel. The parties have since consented to Judge Firko's addition to the panel without the need for further oral argument.

Defendant Zia Berisha appeals the denial of his post-conviction relief (PCR) petition based on a claim he was deprived of the effective assistance of both trial and appellate counsel. Because we agree with the argument that defendant's trial attorney should have but failed to seek jury instructions on the defense of self-defense – an issue clouded by our inconsistent reasoning when rejecting defendant's arguments in his direct appeal – we reverse the order denying post-conviction relief and remand for a new trial.

I

On the morning of November 7, 2007, Michael Marro, Jr., was found dead in his Jersey City apartment. Police investigation culminated in the indictment of defendant and Agim Gjonbalaj; both were charged with first-degree murder, N.J.S.A. 2C:11-3(a), and other related offenses. They were tried together in January and February 2010; defendant was convicted of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a), a lesser-included offense of first-degree murder, among other things, and Gjonbalaj was convicted of second-degree aggravated assault but acquitted of all other charges. On May 27, 2010, defendant was sentenced to a thirty-year prison term; lesser concurrent terms were imposed on the other convictions.

A-2496-16T1

In his direct appeal, defendant claimed the trial judge erred by: refusing to grant a severance; admitting evidence of prior bad acts; failing to instruct the jury on the defenses of voluntary intoxication and self-defense; instructing the jury in a way that opened the door to a robbery or felony-murder conviction on acts not charged in the indictment; and declaring that defendant's thirty-year prison term would begin to run after his completion of a sentence on an unrelated matter. We rejected all these arguments and affirmed, State v. Berisha, No. A-2191-10 (App. Div. June 14, 2012), and the Supreme Court denied certification, 213 N.J. 396 (2013).

Defendant timely filed a PCR petition in May 2015. An evidentiary hearing, at which only defendant's trial attorney testified, took place in November 2016. On January 6, 2017, the PCR judge rendered a written decision denying defendant's petition.

Defendant appeals, arguing[2]:

> I. DEFENSE COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST THAT THE COURT INSTRUCT THE JURY AS TO THE DEFENSE OF SELF-DEFENSE IN RELATION TO EACH OF THE OFFENSES IN THE INDICTMENT.
>
> II. TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO RAISE A PROPER

---

[2] For brevity's sake, we have omitted defendant's sub-headings.

CHALLENGE TO THE CO-DEFENDANT'S TESTI-MONY CONCERNING INCRIMINATING STATE-MENTS ALLEGEDLY UTTERED BY [DEFEN-DANT].

III. THE PCR COURT ERRED IN REFUSING TO SET ASIDE THE CONVICTIONS BECAUSE THE CO-DEFENDANT IMPROPERLY DETAILED THE EXTENT AND METHODS OF [DEFENDANT'S] CDS ABUSE.

IV. [DEFENDANT] WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DUE TO VARIOUS ADDITIONAL OMISSIONS [SPECIFICALLY, COUNSEL'S FAILURE TO REQUEST A RECORDED CHARGE CONFERENCE].

V. THE USE OF A SUBSTITUTE MEDICAL EXAMINER AND HEARSAY AUTOPSY REPORT VIOLATED THE CONFRONTATION CLAUSE.

Because we agree defendant was deprived of the effective assistance of trial counsel due to counsel's failure to seek a jury charge on self-defense, and because we are satisfied that this error prejudiced defendant and requires that he be given a new trial, we need not discuss the other issues.[3]

---

[3] For example, the issues generated by the fact that both defendant and Gjonbalaj were tried together will not be repeated, so we need not decide whether trial counsel should have better advocated defendant's position on severance. The argument that defense counsel should have sought a charge conference on the record also will not likely be repeated. And the questions raised about the replacement medical examiner, who testified at the 2010 trial, will be reconsidered at the new trial in light of the principles announced in State v. Bass, 224 N.J. 285 (2016).

A-2496-16T1

II

An understanding of the conflicting and uncertain evidence adduced at the joint trial reveals the need for post-conviction relief.

In deciding defendant's direct appeal, we recounted how, on November 7, 2007, Marro was found dead in his Jersey City apartment. His head was "bloodied" and the apartment was "in considerable disarray." Berisha, slip op. at 3. A police detective "swabbed the apartment for blood stains and biological evidence" and took "samples from the outside door handle, the hallway closet door, the hallway, a sliding glass door, the television and the glass table top." Ibid. The detective also found "a partially-burnt candle on the living room floor." Ibid.

The day before Marro's body was found, police stopped a vehicle for a driving infraction; defendant was driving and Gjonbalaj was a passenger. In light of what occurred at that vehicle stop, defendant was arrested for marijuana possession. One of the officers noticed candle wax on defendant's jacket.

At trial, a forensic scientist opined that the wax from the candle in Marro's living room was "similar" in "composition" to the candle wax taken from the jacket. Another forensic scientist testified that one swab of blood taken from

A-2496-16T1

the jacket matched Marro's DNA profile and another matched Gjonbalaj's DNA profile.

During defendant's marijuana arrest, police seized from him four wrist watches. At trial, the State called a watchmaker, who had known Marro for "[s]ix to eight years"; he testified that three of these watches belonged to Marro.

The State also called an assistant medical examiner, Dr. Lyla Perez, who testified about autopsy findings generated by another medical examiner. She opined that "the cause of death was blunt force trauma as well as a gunshot wound to the head." Ibid.

After the State rested, Gjonbalaj took the stand in his own defense. We described his testimony in our earlier opinion:

> His testimony began with an explanation of how he met defendant. Gjonbalaj testified that he sold marijuana "[o]ff and on" ever since graduating from high school in 1995, but started selling "full-time" in early 2005. Gjonbalaj met defendant, whom he called "Zee," at a nightclub in 1999, through one of defendant's relatives named "Bash." Gjonbalaj and defendant remained in contact for the next eight years. Notably, Gjonbalaj and defendant saw each other again in August 2007, after Gjonbalaj called defendant looking for marijuana to sell. Gjonbalaj made a similar inquiry in early November.
>
> On November 5, 2007, Gjonbalaj called defendant, who confirmed that the shipment would arrive either that night or the next morning. The shipment arrived on

November 6, 2007. Defendant and Gjonbalaj met at a gas station in Elizabeth. Over defendant's objection, Gjonbalaj testified that he "could tell like [defendant] was on something." Again, over defendant's objection, Gjonbalaj said he "could tell" defendant was under the influence of [O]xycontin because defendant's "face was a little droopy" and defendant's fingers were stained purple, which Gjonbalaj attributed to touching the purple coating on [O]xycontin pills.

Although Gjonbalaj expected defendant to drive to the Bronx, then to Brooklyn and then home to Staten Island as the two had earlier agreed, defendant informed him that he needed to make a stop in New Jersey to deliver some of the marijuana to a buyer. Defendant and Gjonbalaj arrived at an apartment building, which Gjonbalaj later learned was in Jersey City. When they arrived, defendant told Gjonbalaj to "come upstairs with me" and "grab that bag [of marijuana] for me." When they arrived upstairs at Marro's apartment, it was clear to Gjonbalaj that defendant and Marro – whom he had never met – knew each other.

Gjonbalaj remained in the living room while defendant and Marro went outside to the balcony to discuss the details of defendant's sale of the marijuana to Marro. When Marro walked back in, according to Gjonbalaj, "he seemed like he was upset. He seemed pissed off." Almost immediately, defendant and Marro began fighting. "[T]hey started tussling and you could hear their feet shuffling on the floor." The argument soon escalated.

Gjonbalaj described how Marro grabbed defendant's arms as the two began "pulling each other side to side a little bit and . . . Zee lunged forward, [pushing] the guy backwards and it looked like [Marro] tripped as he was going back, and he fell and crashed into the coffee

table." According to Gjonbalaj, although defendant fell to the floor as well, "the guy Marro got the brunt of it because he fell straight back and he didn't have the protection of his hands because he was holding on to Zee's hands." When Marro's body "smacked" the back of the coffee table, "[t]he table came flipping up," hitting Marro in the head and breaking the glass. The lit candle that had been on the coffee table flew into the air.

Even though Gjonbalaj did not believe Marro was able to stand, Marro stood up and began throwing what Gjonbalaj described as "sloppy punches" at defendant, not hitting him. Defendant pushed Marro, causing Marro to hit the wine rack that was against the wall. Gjonbalaj heard a "loud crash," after which "bottles went flying everywhere[.]"

As Marro began crawling on his knees toward defendant, Gjonbalaj heard a gunshot. He could not see what was in defendant's hand during the struggle, but, after hearing the gunshot, Gjonbalaj looked back and saw "something that looked like a revolver in [defendant's] hand." Fearing that the police would arrive in response to the sound of the gunshot, Gjonbalaj left the apartment alone, and walked to defendant's truck. Gjonbalaj concluded his direct examination by stating that he did not go to Marro's apartment with the intent to rob, kill or inflict serious harm to Marro that night, and that he did not see defendant with a gun before he heard the gunshot.

[Id. at 6-9.]

Defendant did not testify.

As revealed by counsel's opening statement and the questioning of the State's witnesses, the defense theory was that the police had made numerous, serious mistakes during the investigation. But, once Gjonbalaj testified and pointed the finger at defendant, counsel's summation, which followed soon after, not only reprised the botched-investigation theory[4] but also referred the jury to evidence supportive of a claim of self-defense. For example, defendant's attorney alluded to the bruising on Marro's knuckles found during his autopsy. Counsel also pointed out those circumstances in Gjonbalaj's story that supported a claim that Marro posed a threat to defendant:

> [W]hat do we have in [Marro's] apartment? We have five guns. Three handguns, a shotgun, a rifle, a stun gun, loaded handguns. . . . Gjonbalaj testified that after . . . Marro got in his face and the whole argument took place [Marro] went over to the area of the entertainment center and the next thing you saw they [defendant and Marro] were both struggling with a gun.

So, the defense theory was not limited to a critique of the police investigation and how those defects gave rise to a reasonable doubt about defendant's

---

[4] Defense counsel argued in his summation that the police made 112 mistakes during the investigation, including a demonstrable inability to account for defendant's jacket for a period of three or four days after an officer signed for it and removed it from the jail at some point after defendant's marijuana arrest.

A-2496-16T1

involvement in the crimes charged[5]; instead, defendant's summation unmistakably asserted that the evidence also supported a claim that defendant acted in self-defense.

## III

Post-conviction relief is "New Jersey's analogue to the federal writ of habeas corpus." State v. Preciose, 129 N.J. 451, 459 (1992). It is "a defendant's last opportunity to raise a constitutional challenge to the fairness and reliability of a criminal verdict in our state system." State v. Feaster, 184 N.J. 235, 249 (2005). And it bears reminding, that the PCR procedure is not solely of interest to the convicted; the State and its citizens have an important interest in ensuring the fairness of criminal proceedings. See State v. Koedatich, 112 N.J. 225, 332 (1988).

A PCR application places the burden on a defendant to "establish the right to . . . relief by a preponderance of the credible evidence." Preciose, 129 N.J. at 459. Defendant claims entitlement to post-conviction relief based on, among

_____

[5] As for the robbery charge of which defendant was convicted – he was acquitted on the armed robbery charge – counsel alluded to the many circumstances that suggested defendant did not go to Marro's apartment with an intent to rob him, including evidence that: he and Gjonbalaj parked in front of the apartment; spoke to the doorman; brought what was alleged to be a large quantity of marijuana with him ostensibly to sell to Marro; and left a significant amount of cash and other watches and jewelry behind.

A-2496-16T1

other things, the ineffectiveness of his attorney in failing to request a jury charge on self-defense. To demonstrate attorney ineffectiveness, a defendant must satisfy the same two-prong test for claims based on the federal constitution, Strickland v. Washington, 466 U.S. 668, 687 (1984), and those based on the state constitution, State v. Fritz, 105 N.J. 42, 58 (1987). This test first requires a showing of a "performance [so] deficient" that the attorney could not be said to be "functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. And, second, a defendant must show prejudice, that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Ibid. After close examination of the parties' arguments and the record, we are satisfied that defendant established an entitlement to a new trial.

In reaching this conclusion, we reject the State's argument that the self-defense issue is procedurally barred by Rule 3:22-5. The State argues that the attorney's effectiveness concerning self-defense is barred here because defendant already argued in his direct appeal – albeit unsuccessfully – that the trial judge should have sua sponte instructed the jury on self-defense. There is, in fact, no doubt that contentions regarding the defense of self-defense played a large role in defendant's direct appeal. But there lies the rub because, as

11

defendant forcefully argues in this appeal, our prior decision was hardly conclusive on that point. In fact, defendant claims we were not even consistent when discussing the self-defense issues in our direct appeal opinion. And he is right. We cannot ignore nor attempt to parse our way through what we previously held; instead, we must acknowledge that we were inconsistent in our holdings about the part self-defense played at trial when we affirmed defendant's conviction.[6]

First, in considering defendant's claim in his direct appeal that the trial judge erred in denying his motion to sever his case from Gjonbalaj's case, we recognized that

> although Gjonbalaj identified defendant as the shooter, <u>defendant also presented a claim of self-defense, which likely resulted in the jury finding defendant guilty of the lesser[-]included offense of aggravated manslaughter, rather than first-degree murder</u>. The jury did not have to completely believe Gjonbalaj or defendant in order to reach its verdict.
>
> [<u>Berisha</u>, slip op. at 13 (emphasis added).]

---

[6] The issue raised here about self-defense was not decided previously. What we decided was whether the judge was required to instruct self-defense without a request from defendant. Whether counsel was ineffective for failing to request the charge is a different matter from the question posed in the direct appeal. In deciding the question then posed, we never held that had counsel made the request, the judge would have correctly refused it.

A-2496-16T1

As can be seen, not only did we recognize at that point in our opinion that defendant "presented a claim of self-defense," but we also believed – because the jury acquitted him of first-degree murder and convicted only of a lesser-included offense – that the jury to some degree bought into that defense.

But, later in the same opinion, we rejected defendant's argument about the judge's failure to instruct on self-defense:

> As for the judge's failure to sua sponte instruct the jury on self-defense, the use of deadly force is only justifiable when a defendant reasonably believes that such force is necessary to protect himself against death or serious bodily harm. N.J.S.A. 2C:3-4(b)(2). Here, defendant discharged a firearm, resulting in the death of Marro, even though Marro himself had no weapon and was not threatening defendant with deadly force. Under such circumstances, the defense of self-defense would likely have been unsuccessful. For that reason, the judge's omission of an instruction on self-defense had no capacity to produce an unjust result.
>
> [Berisha, slip op. at 24-25 (emphasis added).]

On one hand, we said the jury at least partially believed defendant acted in self-defense because it did not convict him of first-degree murder, id. at 13, and, on the other, we concluded defendant wasn't entitled to a self-defense charge because it "would likely have been unsuccessful," id. at 25. In retrospect, we conclude we were right the first time, when we acknowledged that self-defense was a viable issue and had, in fact, benefited defendant, and we were wrong

13

when we concluded elsewhere in the same opinion that the omission of an instruction on self-defense had no capacity to produce an unjust result.

This confession of error is certainly significant in this appeal of the denial of defendant's ineffectiveness argument. Our earlier mistake negates the State's claim to a procedural bar: the rule-based bar of pursuing in a PCR petition an argument previously decided on appeal cannot possibly encompass an earlier appellate ruling that was demonstrably erroneous.[7] And our previous error also reveals that defendant met the second <u>Strickland</u> prong because he was deeply prejudiced by the absence of a jury charge on self-defense. It goes without saying that the first prong was established – that counsel seriously erred by failing to request a self-defense jury charge[8] – because the absence of such a

---

[7] The rule-based bar at the PCR stage against the presentation of a claim that could have been previously raised "is not an inflexible command," <u>State v. Franklin</u>, 184 N.J. 516, 528 (2005), nor does it require "acquiesce[nce] to a miscarriage of justice," <u>State v. Nash</u>, 212 N.J. 518, 546 (2013).

[8] At the PCR evidentiary hearing, trial counsel testified and acknowledged his error and his ineffectiveness. He testified – as is apparent – that the defense was "surprised" by Gjonbalaj's testimony; he also testified that Gjonbalaj's testimony provided a factual basis for a defense of self-defense, that he could not recall requesting it, and that there was no "strategic" reason for failing to request the charge.

charge, as established by our earlier correct holding in the direct appeal, id. at 13, had merit.

The factual record certainly compels our conclusions on both Strickland prongs. Although the evidence about what actually occurred in Marro's apartment was questionable enough to permit a rational factfinder to draw many possible conclusions, the evidence did not necessarily support our earlier determination in the direct appeal that – in common parlance – defendant brought a gun to a fist fight,[9] and, therefore, defendant could not plausibly contend he acted in self-defense. It may be that the State argued that after a physical encounter – that involved defendant, Gjonbalaj, and Marro – defendant shot a significantly incapacitated Marro in the head. But other reasonable theories may be drawn from the known facts, all of which give rise to a feasible defense of self-defense.

Indeed, it is important to recognize that the State didn't even offer a concrete view of the cause of death that might have – if accepted – presented a clearer understanding of how self-defense would apply here or would have better

---

[9] This is pretty much the gist of our holding on that part of the direct appeal when we rejected the argument that the judge should have sua sponte charged self-defense. Indeed, our statement that "Marro himself had no weapon" during the melee, Berisha, slip op. at 24, was one of the many questionable circumstances presented that the jury may not have agreed with.

<span>A-2496-16T1</span>

supported our earlier mistaken conclusion that self-defense would not have been helpful. The testimony of the State's own expert raised a reasonable doubt about the precise cause of death by offering three probabilities; she testified that Marro died from blunt force trauma, from a gunshot wound, or both:

> Q. . . . Now, Doctor, based on what you have reviewed and testified to, within a reasonable degree of medical certainty, what is your opinion as to the cause and manner of death of this individual?
>
> A. The cause of death is gunshot wound to the head and blunt force injuries and the manner of death is homicide.[10]
>
> Q. . . . [H]ow were you able to come to the conclusion that the cause of death was both the gunshot wound and blunt force injuries?
>
> A. By reviewing the pictures and reviewing also the injuries to the head.
>
> Q. Okay. And at one point, you had described within the head itself certain injuries and you had said that – well, correct me if I'm wrong – you said that it could have been caused by the gunshot or the blunt force or by both?
>
> A. Yes. By either, or, or both.

---

[10] We note that the defense did not object to the improper response that "the manner of death is homicide." Whether a homicide occurred was a question for the jury, not the witness. The medical examiner should have been limited to the mechanics of Marro's death, not its legal cause. See State v. Jamerson, 153 N.J. 318, 338 (1998).

With that as the only opinion about the cause of Marro's death, the jury could have made any number of findings as to the overall circumstances and the respective involvement not only of defendant and Gjonbalaj but Marro as well.

How the jury framed for itself the particular events that generated Marro's death is, of course, not entirely clear to a reviewing court or for those involved at the trial, due to jury-deliberation secrecy. But it is clear that the jury did not endorse the State's theory that defendant committed first-degree murder because defendant was acquitted of that charge. With uncertainty from the State's own proofs about the cause of death, and the involvement of three individuals – one silenced by death, one invoking his constitutional right to remain silent, and a third who testified but whose story was also not entirely endorsed by the jury (or else he would have been acquitted of all charges) – the jury's particular shared vision of what took place between and among defendant, Gjonbalaj and Marro is not entirely knowable. But it seems highly plausible that the jury rejected the view that defendant shot a defenseless Marro in the head; had it thought so, the jury may very well have convicted him of first-degree murder and would not have likely – as we held in the direct appeal, Berisha, slip op. at 13 – accepted to some degree that defendant was defending himself.

A-2496-16T1

The evidence presented to the jury could have led to a number of conclusions that would support the need for self-defense instructions. For example, the jury heard evidence that Marro had a number of weapons in his apartment, and at some point during the melee described by Gjonbalaj, Marro went to an entertainment unit – a circumstance that immediately caused defendant to reach out and grasp Marro's hands. With that, the fight resumed, and a gunshot rang out. Gjonbalaj's testimony – again the only direct evidence of what actually occurred – suggested that Marro may have reached for one of his many firearms and defendant immediately reached for Marro's hands to keep Marro from using it on him. This evidence clearly warranted an instruction to the jury on self-defense. Moreover, at various times throughout his version, Gjonbalaj identified Marro as the aggressor. There were more than adequate factual grounds for a jury instruction on self-defense.

Prejudice from counsel's failure to seek a self-defense charge is also apparent from the charge that the judge would have been required to give. See generally N.J.S.A. 2C:3-4; Model Jury Charges (Criminal), "Justification - Self Defense In Self Protection" (Rev. June 13, 2011). Even though we thought in our 2012 opinion that defendant actually received the benefit of his self-defense contentions, there were greater benefits available to him – including acquittal

not only of first-degree murder, which he obtained, but also acquittal of aggravated manslaughter, for which he was convicted – had the jury been advised of the legal parameters of self-defense. Again, we do not draw this conclusion because we have our own particular view of what happened on the evening of November 6, 2007; we don't. We draw that conclusion because the evidence did not foreclose the application of self-defense principles. So, even though the jurors did not necessarily accept all of Gjonbalaj's version, they were also satisfied the events were not entirely as depicted by the prosecution.[11] We are satisfied that any possible version of the facts consistent with the jury's verdict fairly invited consideration of self-defense and that defendant was prejudiced by his attorney's failure to request that the judge instruct the jury on self-defense. A jury could very well have concluded from the evidence and the circumstances that defendant had a subjective belief that deadly force was necessary at some or all points of the melee and that his subjective belief was objectively reasonable. State v. Jenewicz, 193 N.J. 440, 450 (2008); State v.

---

[11] The jury undoubtedly found Gjonbalaj played a significant role since it convicted him of second-degree aggravated assault. State v. Gjonbalaj, No. A-0452-10 (App. Div. June 20, 2012), certif. denied, 213 N.J. 396 (2013). We have since affirmed the denial of Gjonbalaj's post-conviction relief petition. State v. Gjonbalaj, No. A-4769-13 (App. Div. Oct. 19, 2015), certif. denied, 224 N.J. 245 (2016).

Williams, 168 N.J. 323, 332-33 (2001); State v. Kelly, 97 N.J. 178, 199-200 (1984).

In sum, the evidence fairly suggested the applicability of self-defense – as we in fact recognized in disposing of the direct appeal, Berisha, slip op. at 13 – and counsel's failure to request a jury instruction on this defense prejudiced defendant's right to a fair trial.

The order denying post-conviction relief is reversed and the matter remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2496-16T1