**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0516-17T2

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

STEPHANIE HAND,

 Defendant-Appellant.

_____

> Argued October 11, 2018 – Decided August 14, 2019
>
> Before Judges Simonelli, Whipple and DeAlmeida.
>
> On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 14-02-0007.
>
> Hilary L. Brunell argued the cause for appellant (Mandelbaum and Salsburg, attorneys; Vincent J. Nuzzi, of counsel; Hilary L. Brunell, on the briefs).
>
> Sarah Lichter, Deputy Attorney General argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Sarah Lichter, of counsel and on the brief).

PER CURIAM

Defendant Stephanie Hand appeals from a September 19, 2017 judgment of conviction of conspiracy, financial facilitation of criminal activity (money laundering), and theft by deception. We reverse defendant's money laundering conviction, affirm her remaining convictions, and remand for resentencing.

I.

The following facts are derived from the record. At the time of the offenses, defendant was an attorney licensed to practice law in this State. She participated in a mortgage fraud scheme with co-defendants Thomas D'Anna and Julio Concepcion centered on the fraudulent sale of two properties owned by D'Anna to straw purchasers.

Concepcion obtained the stolen identities of people in Puerto Rico to use as straw purchasers. He created false identification documents, driver's licenses, social security numbers, bank accounts, wage statements, and tax information using the stolen identities.

D'Anna obtained mortgages in the names of the straw purchasers, using the fake documents and financial information created by Concepcion. He completed mortgage applications in the names of the straw purchasers, which he submitted to a mortgage broker, and created fake sales contracts listing the straw purchasers as the buyers of the properties. The mortgage broker, relying

on the false documentation created by D'Anna and Concepcion, deemed the applications complete and turned them over to a lender.

Relying on the falsified documents, the lender verified the purchasers' bank accounts had sufficient funds to cover the loan payments. In addition, the lender verified the buyers' tax returns reported sufficient income to qualify for the loans and bore social security numbers matching those on the loan applications. The lender approved the mortgage loans. Both loans were conditioned on the purchasers making a cash down payment of ten percent of the purchase price.

Defendant served as the closing agent for both transactions, purportedly representing the purchasers. Another attorney represented D'Anna as the seller, but did not appear at the closings. According to defendant, prior to the first transaction someone claiming to be the purchaser appeared at her office, signed the closing documents, and left before D'Anna arrived. The "purchaser" did not bring a check for the ten percent down payment and said he would give the down payment check to D'Anna within twenty-four hours. After defendant relayed this information to D'Anna, she allowed the closing to go forward.

Defendant completed a Department of Housing and Urban Development (HUD) closing statement falsely certifying that she received the ten percent

3

down payment from the purchaser. According to the lender's closing instructions, the settlement agent was required to obtain the down payment check, place the check in an escrow account, and certify that the HUD closing statement contained a true and accurate statement of all funds received and disbursed. Defendant falsely certified that she complied with the instructions and allowed the loan to close under these false pretenses. A representative of the lender testified the lender would not have issued the loan proceeds had it known that the ten percent down payment was not actually received by defendant.

Based on defendant's false statements, the lender released the loan proceeds to defendant's attorney trust account. In addition to paying various fees associated with the transaction, defendant made the following disbursements from her attorney trust account: (1) she paid two existing mortgages D'Anna had taken on the property; (2) she issued a check to a company controlled by Concepcion, purportedly to satisfy an outstanding invoice for remodeling work at the property that was never performed; and (3) issued the remaining funds to D'Anna, although the amount he received was less than was listed on the HUD statement because defendant had not collected the

4

down payment. Defendant was paid attorney's fees for her participation in the closing.

Concepcion was in control of the bank account opened in the name of the straw purchaser. He made three payments on the mortgage following the closing before halting payments. The lender ultimately was compelled to foreclose on the property.[1]

The closing for the second property took place a few weeks later. The "purchaser" never appeared at defendant's office and defendant knew that no check for the ten percent down payment had been given to D'Anna. Once again, defendant allowed the closing to go forward and completed a HUD closing statement falsely stating that the purchaser had made the down payment. She again falsely certified that she complied with the lender instructions requiring her to place the purchaser's down payment in an escrow account. As was the case with the first transaction, had the lender been made aware that the buyer had not made the down payment, the lender would not have issued the loan.

Based on defendant's false statements, the lender released the loan proceeds to defendant's attorney trust account. In addition to paying various

---

[1] Testimony at trial suggested Concepcion made the mortgage payments in order to avoid the suspicion that may have been triggered if the loan immediately went into default.

A-0516-17T2

fees associated with the transaction, defendant made the following disbursements from her attorney trust account: (1) she paid an existing mortgage D'Anna had taken on the property; (2) she issued a check to a company controlled by Concepcion, purportedly to satisfy an outstanding invoice for remodeling work at the property that was never performed; and (3) issued the remaining funds to D'Anna, although the amount he received was less than was listed on the HUD statement because defendant had not collected the down payment. Defendant was paid attorney's fees for her participation in the second closing.

As was the case with the first property, Concepcion was in control of the bank account opened in the name of the straw purchaser. He made a few payments on the mortgage following the closing before halting payments. The lender ultimately was compelled to foreclose on the property.

A grand jury indicted defendant, D'Anna, and Concepcion, charging them with: (1) first-degree conspiracy to commit money laundering and/or theft by deception, N.J.S.A. 2C:5-2, N.J.S.A. 2C:21-25(b)(2)(a), and N.J.S.A. 2C:20-4(a) (count one); first-degree money laundering, N.J.S.A. 2C:21-25(b)(2)(a)

(count two); and second-degree theft by deception, N.J.S.A. 2C:20-4(a) (count three).[2]

Defendant was tried separately. She denied having engaged in a conspiracy with D'Anna and Concepcion and testified that she was hired to represent the "purchasers" in the two real estate transactions unaware of the underlying scheme. D'Anna entered a guilty plea to second-degree conspiracy. He testified at trial and denied knowing that Concepcion had obtained stolen identifications and created fake identification documents and financial information. He admitted, however, that he and defendant entered into an agreement to lie on the HUD closing statements regarding the receipt of down payments from the purchasers in order to secure issuance of the two loans and complete the closings. In exchange for his testimony, the State recommended D'Anna receive a probationary sentence.

The trial court declined defense counsel's request to cross-examine D'Anna with respect to the third fraudulent transaction not involving defendant alleged in the indictment. The court held that evidence regarding the third transaction was not relevant to the charges before the jury.

---

[2] The indictment also charged D'Anna, Concepcion, and two other defendants with respect to a third alleged fraudulent sale of property. The State did not allege that defendant was involved in the third sale.

In addition, defense counsel sought to cross-examine D'Anna with respect to the sentencing exposure he faced when he entered into his plea agreement. Defense counsel sought to question D'Anna with respect to a twenty-year maximum potential sentence on the charges in the indictment, including the third transaction that did not involve defendant.[3] The court, however, limited cross-examination to questions regarding the seven-year sentence offered to D'Anna in the State's first plea offer. In addition, the court noted that D'Anna, as a first-time offender, was unlikely to receive the maximum sentence on all charges if convicted after trial. The court determined that reference to the potential twenty-year sentence did not reflect the reality of D'Anna's sentencing exposure and could, therefore, mislead the jury. Defense counsel was permitted to explore all other aspects of D'Anna's plea agreement with the State, including that his counsel negotiated the initial seven-year offer down to a probationary sentence.

Concepcion also testified at trial. He admitted his involvement in the mortgage fraud and stated that D'Anna was a full-fledged co-conspirator from the inception of the scheme. Concepcion testified that he did not know defendant, had not conspired with her, and never met her.

---

[3] Although the court referred to D'Anna's potential exposure as twenty years, defendant's brief states that his potential exposure was fifty years. Our analysis is the same under either potential term of imprisonment.

At the close of the State's case, defendant moved for a judgment of acquittal on the money laundering charges. The court denied the motion, concluding the record contained sufficient evidence on which a jury could find defendant guilty of money laundering. The jury thereafter found defendant guilty of second-degree conspiracy on count one, second-degree money laundering on count two, and second-degree theft by deception on count three.

Defendant moved for a new trial, arguing the court's limitation on her counsel's cross-examination of D'Anna and errors in the court's jury instructions on money laundering resulted in a miscarriage of justice. On September 15, 2017, the court denied defendant's motion in an oral opinion.

On the same day, the court sentenced defendant as a third-degree offender. According to the State's merits brief, the court sentenced defendant to an aggregate term of four years imprisonment. Defendant's merits brief states that the court sentenced her to two consecutive four-year terms, an aggregate term of eight years. The judgment of conviction contains conflicting information with respect to defendant's sentence. According to the judgment of conviction, the court merged count one into count two and sentenced defendant on count two to a four-year term of imprisonment. In addition, the judgment of conviction states that on count three the court sentenced defendant to a four-year

term of imprisonment to run consecutive to the sentence on count two. This would constitute an aggregate eight-year term of imprisonment. However, the judgment of conviction also states "004 Years" under "Total Custodial Term." The transcript of the sentencing hearing indicates that the court intended to impose consecutive sentences for an aggregate eight-year term. The court also imposed an anti-money laundering profiteering penalty of $250,000, N.J.S.A. 2C:21-27.2, along with other statutory fees.

This appeal followed. Defendant makes the following arguments for our consideration:

> POINT I
>
> THE JURY INSTRUCTIONS ON MONEY LAUNDERING, COUPLED WITH THE STATE'S MISLEADING CLOSING ARGUMENTS, LED TO AN UNFAIR TRIAL. (Raised as Plain Error).
>
> > A. The Crime of Money Laundering Requires Proof of both an underlying Criminal Act and Concealment.
> >
> > B. The State's Discussion of Money Laundering Invited the Jury to Convict without Finding a Separate Act of Concealment.
> >
> > C. The Court's Instructions Did Not Adequately Define the Statutory Element of Concealment and Were, Therefore, Plain Error.
>
> POINT II

10

THE DEFENDANT'S SIXTH AMENDMENT RIGHTS WERE PREJUDICED WHEN THE TRIAL COURT PRECLUDED THE DEFENSE FROM FULLY CROSS-EXAMINING THE STATE'S COOPERATING WITNESS ON THE BENEFIT HE RECEIVED IN EXCHANGE FOR HIS TESTIMONY.

> A. It Was Prejudicial Error to Prohibit Defense Counsel from Questioning the State's Witness about His Full Sentencing Exposure Prior to the Plea Deal.

POINT III

THE STATE'S PROOFS, AT THE CLOSE OF [] ITS CASE, WERE INSUFFICIENT TO ESTABLISH THE CRIME OF MONEY LAUNDERING. THE DEFENDANT WAS THEREFORE ENTITLED TO A JUDGMENT OF ACQUITTAL ON THOSE CHARGES RELATING TO THE MONEY LAUNDERING OFFENSES.

> A. The Defendant Was Entitled to a Judgment of Acquittal on the Money Laundering Offenses at the Close of the State's Case.

## II.

We use the same standard as the trial judge in reviewing a motion for judgment of acquittal at the close of the State's case. State v. Bunch, 180 N.J. 534, 548-49 (2004). We must determine

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn

therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.

[State v. Reyes, 50 N.J. 454, 459 (1967).]

Under Rule 3:18-1, the court "is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State.'" State v. Muniz, 150 N.J. Super. 436, 440 (App. Div. 1977). "If the evidence satisfies that standard, the motion must be denied." State v. Spivey, 179 N.J. 229, 236 (2004).

We are satisfied that the evidence in this case, viewed in its entirety and giving the State all favorable inferences therefrom, was insufficient to allow a reasonable jury to find defendant guilty of money laundering beyond a reasonable doubt.

N.J.S.A. 2C:21-25(b)(2)(a), the "concealment" provision of the money laundering statute, under which defendant was charged, states:

A person is guilty of a crime if the person:

. . . .

b.    engages in a transaction involving property known or which a reasonable person would believe to be derived from criminal activity

. . . .

(2)    knowing that the transaction is designed in whole or in part:

(a)    to conceal or disguise the nature, location, source, ownership or control of the property derived from criminal activity . . . .

A conviction under N.J.S.A. 2C:21-25(b)(2)(a) requires two elements: (1) the underlying criminal activity that generates the property; and (2) the money-laundering transaction where the nature, location, source, ownership or control of that property is concealed or disguised. State v. Harris, 373 N.J. Super. 253, 266 (App. Div. 2004). This interpretation of the statute comports with its purpose: to "stop the conversion of ill-gotten criminal profits, . . . and punish those who are converting the illegal profits, those who are providing a method of hiding the true source of the funds, and those who facilitate such activities." State v. Diorio, 216 N.J. 598, 625 (2014) (quoting N.J.S.A. 2C:21-23(e)).

The federal courts have interpreted the federal money laundering statute similarly. See 18 U.S.C. § 1956(a)(1). The statute does not prohibit "non-money laundering acts such as a defendant's depositing the proceeds of unlawful activity in a bank account in his own name and using the money for person purposes." United States v. Conley, 37 F.3d 970, 979 (3d Cir. 1994).

Money laundering must be a crime distinct from the crime by which the money is obtained. The money laundering statute is not simply the addition of a further

13

penalty to a criminal deed; it is a prohibition of processing the fruits of a crime or of a completed phase of an ongoing offense.

[United States v. Abuhouran, 162 F.3d 230, 233 (3d Cir. 1998) (citation omitted).]

Even when viewing the evidence in the light most favorable to the State, the record contains evidence of only defendant's criminal acts of conspiracy and theft by deception and not a subsequent transaction by defendant designed to conceal or disguise the nature, location, source, ownership, or control of the property obtained through her criminal activity. Defendant was charged with conspiring with D'Anna and Concepcion to commit a theft by deception by perpetrating a mortgage fraud. The mortgage fraud was carried out by obtaining two mortgage loans based on fraudulent loan applications and fake financial and identification documents. Defendant's role in the fraud was to submit falsified HUD closing statements, to receive loan proceeds issued based on those false statements, and to distribute the proceeds in accordance with the falsified statements. She completed her criminal activity when she distributed the loan proceeds to satisfy D'Anna's outstanding mortgages, paid Concepcion for fraudulent remodeling invoices, paid herself attorney's fees, satisfied other fees, and distributed the remainder to D'Anna.

A-0516-17T2

The record contains no evidence of any subsequent transaction by defendant to conceal or disguise the nature, location, source, ownership or control of the loan proceeds. We reject the State's argument that defendant's distribution of a portion of the loan proceeds to entities controlled by Concepcion to satisfy fraudulent remodeling invoices constituted money laundering. While those distributions were intended to hide Concepcion's involvement in the scheme, they were part and parcel of the underlying criminal activity and constituted his share of the proceeds of that activity. The State attempts to draw too fine a line by characterizing this element of the underlying criminal offense as a separate instance of money laundering. Defendant's conviction on count two is, therefore, reversed. In light of our decision reversing defendant's money laundering conviction, we need not decide her other arguments regarding that charge.

III.

Defendant's argument regarding the limitations the court imposed on the cross-examination of D'Anna concern her remaining convictions. Both the Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution provide in a criminal trial the accused has the right "to be confronted with the witnesses against him[.]" U.S. Const. amend. VI; N.J.

<u>Const.</u> art. I, ¶ 10. "Our legal system has long recognized that cross-examination is the 'greatest legal engine ever invented for the discovery of truth.'" <u>State v. Basil</u>, 202 N.J. 570, 591 (2010) (quoting <u>California v. Green</u>, 399 U.S. 149, 158 (1970)). "[T]he exposure of a witness'[s] motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." <u>State v. Bass</u>, 224 N.J. 285, 301 (2016) (quoting <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 678-79 (1986)). "[A] defendant must be afforded the opportunity through effective cross-examination to show bias on the part of adverse state witnesses." <u>State v. Sugar</u>, 100 N.J. 214, 230 (1985); <u>see also</u> <u>State v. Parsons</u>, 341 N.J. Super. 448, 458 (App. Div. 2001) (holding "a defendant has a right to explore evidence tending to show that the State may have a 'hold' of some kind over a witness, the mere existence of which might prompt the individual to color his testimony in favor of the prosecution") (quoting <u>State v. Holmes</u>, 290 N.J. Super. 302, 312 (App. Div. 1996)). "A . . . claim that there is an inference of bias is particularly compelling when the witness is under investigation, or charges are pending against the witness, at the time that he or she testifies." <u>Bass</u>, 224 N.J. at 303.

"In an appropriate case the right of confrontation will yield to other 'legitimate interests in the criminal trial process, such as established rules of

evidence and procedure designed to ensure the fairness and reliability of criminal trials.'" State v. Castagna, 187 N.J. 293, 309 (2006) (quoting State v. Garron, 177 N.J. 147, 169 (2003)). "That the credibility of a witness may be impeached on cross-examination is well settled" however "[t]he scope of cross-examination is a matter resting in the broad discretion of the trial court." State v. Martini, 131 N.J. 176, 255 (1993), rev'd on other grounds, State v. Fortin, 178 N.J. 540 (2004). "A trial judge may bar inquiry into a witness's potential bias, without offending the Confrontation Clause, because of concerns about 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" Bass, 224 N.J. at 303 (quoting Van Arsdall, 475 U.S. at 679). Pursuant to Rule 403 "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of . . . undue prejudice[.]" N.J.R.E. 403.

Our review of the record in light of these precedents leads us to affirm the court's decision. The court permitted defendant's counsel to cross-examine D'Anna at length about his plea agreement, the degree of the crimes with which he was charged, the fact that he was offered a seven-year term of imprisonment by the State in exchange for his testimony, and that his counsel negotiated an agreement in which the State recommended he receive only a probationary term.

17

The court balanced defendant's right to confront the witness on his expectation of favorable treatment from the State in return for his testimony with the State's right to be free from prejudicial and potential confusing evidence regarding the maximum exposure on the charges D'Anna originally faced. As the court concluded, D'Anna did not realistically face a twenty-year sentence. The State initiated plea negotiations by offering him a recommended seven-year term. In addition, as a first-time offender defendant was unlikely to receive the maximum sentence on each of the counts were he to have been found guilty at trial. The limitation imposed by the court did not prevent defendant from using cross-examination for the desired purpose of questioning D'Anna's credibility by suggesting the State may have influenced his testimony through favorable resolution of his pending criminal charges.

We also agree with the court's conclusion that cross-examination questions regarding the third alleged fraudulent transaction in which defendant was not involved would have elicited irrelevant evidence, likely to cause jury confusion. Moreover, evidence regarding the third transaction would have risked prejudice for defendant, given that the State did not allege she was involved in that fraudulent land sale.

A-0516-17T2

Defendant's conviction of money laundering is reversed.  Her conviction of conspiracy included both a conspiracy to engage in money laundering and a conspiracy to engage in theft by deception.  D'Anna's testimony that he and defendant agreed to submit false HUD statements in order to entice the lender to release the mortgage loans was sufficient for the jury to convict defendant of conspiracy to engage in theft by deception.  We therefore affirm defendant's conspiracy conviction to the extent it is based on a conspiracy to commit theft by deception.  Her remaining conviction is also affirmed.  The matter is remanded for resentencing.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0516-17T2