**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0697-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

KEVAUGHN WRIGHT,
a/k/a  KEVAUGHN BRADY
WRIGHT,

     Defendant-Appellant.

_____

Submitted June 3, 2021 – Decided August 10, 2021

Before Judges Ostrer and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 16-08-0710.

Joseph E. Krakora, Public Defender, attorney for appellant (Scott M. Welfel, Assistant Deputy Public Defender, of counsel and on the brief).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Mark Niedziela, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

On March 17, 2016, at around 7:00 p.m., Elijah McQueen was shot in the neck during an altercation with defendant, Kevaughn Wright. McQueen survived. Approximately five months later, a Passaic County Grand Jury indicted Wright, charging him with: (1) first-degree attempted murder, N.J.S.A. 2C:5-1(a)(1) and 2C:11-3(a)(1) (count one); (2) second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count two); and (3) second-degree possession of a handgun without a permit, N.J.S.A. 2C:39-5(b) (count three). Following a jury trial, defendant was found not guilty on counts one and two, but guilty on count three. The trial court denied defendant's motion for a judgment of acquittal or a new trial, and on August 30, 2019, sentenced him to a five-year prison term, subject to forty-two months of parole ineligibility, pursuant to the Graves Act, N.J.S.A. 2C:43-6(c).

Defendant urges us to reverse his conviction, arguing the trial court erred in limiting his cross-examination of two witnesses, improperly barred him from introducing his victim's parole records, and failed to properly instruct the jury regarding the element of possession. We disagree and affirm.

At defendant's trial, the State presented the testimony of Elijah McQueen's aunt, Robin McQueen, and his cousin, Nijera McQueen, as well as other

A-0697-19

witnesses.  Defendant also testified but Elijah[1] did not appear or testify at the trial.

Prior to Nijera taking the stand, defense counsel advised the trial court that Nijera was indicted and had charges pending against her for third-degree neglect of a disabled person, N.J.S.A. 2C:24-8 (count one); fourth-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(2) (count two); and fourth-degree hindering by providing false information to a law enforcement officer, N.J.S.A. 2C:29-3(b)(4) (count three).  Defense counsel sought permission to cross-examine Nijera regarding her charged offenses.  The judge granted counsel's request regarding counts one and two, but denied his request regarding count three, explaining:

> I am going to exclude any reference to the hindering of apprehension by providing false information to law enforcement as an inadmissible specific instance of conduct under Rule 608 as well as, and let's not forget we, also, have Rules 404 and 405 as well . . . .  Rule[s] 405 and 608 preclude the use of specific instances of conduct to attack the credibility of a witness.  Rule 608 indicates that a tra[it] of character cannot be proved by specific instances of conduct unless, as we know, it had to do with the prior act.  The prior act was a false accusation against the person of a crime similar to the

---

[1] Because Elijah, Robin and Nijera McQueen share the same surname, we hereafter refer to them by their first names for the reader's convenience.  We intend no disrespect in this regard.

A-0697-19

crime [with which the defendant is charged]. I think we can all agree we don't fall into that exception.

Relevant evidence may be excluded on the ground that its probative value [is] substantially outweighed by the risk of undue prejudice, that's Rule 403.

I think here . . . what we stand for in our criminal justice system is that someone is presumed innocent until proven guilty. I have to weigh that, also, with respect to these charges against this potential witness. These are just charges, as we've told our jurors. Charges are a way to bring the matter before the court and the jury for the ultimate determination of whether a person is guilty or not guilty.

So, to bring up [a] false accusation charge in an indictment, to me under [Rule] 403, would be an unfair prejudice to this witness as well . . . . She may decide to take the Fifth and not even want to address these charges. But the fact that this witness, like the defendant, is innocent until proven guilty, I can't allow this particular specific instance of conduct in that relates to her potential untruthfulness when it's a trait o[f] character that's otherwise inadmissible under [Rule] 608.

And, so, for that reason, I'm . . . going to allow, if [defense counsel] wants, counts [one and two] of the indictment because, again, it does not go into the truthfulness, a dishonesty claim, as it does in count [three].

        . . . .

But I'm not going to allow you to ask this witness well, you know, you gave false information at one time to law enforcement, aren't you giving false information today?

4

The judge subsequently clarified that defense counsel could elicit the specific charges Nijera faced on counts one and two, "including degree and potential exposure."

When Nijera took the stand, she testified she dated defendant for several months before the shooting, and on the night before the shooting, she "found [defendant] in bed with someone else." She stated she left her home on March 17 to speak with defendant. According to her testimony, as she and defendant were walking and talking outside, their discussion became "heated." During their argument, Nijera saw the person she "caught [defendant] in bed with," so Nijera and the other woman "end[ed] up fighting" "right by [Elijah's] house." Nijera affirmed that Elijah intervened and he and defendant engaged in a fistfight with one another. Once the fight ended between the two men, Nijera and Elijah went to Elijah's car so he could drive her home. Nijera testified that when she and Elijah arrived at her home, a crowd of twenty to thirty people were there, including defendant and his family members. She stepped out of Elijah's car and was walking toward her home when she saw defendant "and his family were like all in front of the car, so Elijah stopped the car and got out . . . ." According to Nijera, "Elijah went to put his hands up to fight [defendant] and [defendant] pulled out a gun and shot [Elijah] in the throat." Nijera also testified

5

Elijah did not have a gun and that after Elijah was shot, defendant ran from the scene with the gun. Nijera stated she was "[a] hundred percent" sure that defendant was the person who shot Elijah.

During her cross-examination, Nijera acknowledged that in 2016, Elijah "just returned home" from a period of incarceration. Defense counsel asked if Elijah "ever had to return after his period of incarceration," presumably referring to a return to prison, to which Nijera answered, "That I wouldn't know, honestly, no."

Nijera also admitted during cross-examination that she was facing charges for third-degree neglect of a disabled person and fourth-degree hindering apprehension, that her "exposure" on the third-degree charge was "significant," and her charges were lodged against her by "[t]he Prosecutor's Office, though not this specific Prosecutor," for whom she was testifying. On redirect, Nijera confirmed she provided a statement to law enforcement about the shooting on the night it happened, and at that time, no charges were lodged against her. She also testified she was not promised anything by law enforcement in exchange for providing her 2016 statement.

Robin, Nijera's mother, testified that on the evening of the incident, she was looking for Nijera while driving in her car, and when she stopped looking,

A-0697-19

she headed home. As she neared her residence, she saw Elijah's car "was in the middle of the block" and "he wasn't able to drive because [defendant's] family . . . was blocking him from being able to go down the street." She testified she saw defendant interact with Elijah as the two men "started to square up," with their hands raised as if in a "boxer stance," and "[t]he next thing, [defendant] reached into his shorts' pants and pulled out a gun, pow." Robin testified that Nijera was standing behind Elijah when Elijah was shot, "Elijah had no weapon," and defendant "took off running" from the scene. Like Nijera, Robin stated she was "a hundred percent" sure of what she saw during the incident.

On cross-examination, Robin acknowledged Elijah previously was incarcerated, but she did not remember when that was or why he was incarcerated. Robin also testified Elijah possibly was incarcerated for more than two years. Defense counsel asked her if Elijah "ever [had] to go back to jail," to which Robin responded, "No, not that I know of."

Several days after Nijera, Robin, and other witnesses testified for the State, the trial resumed. At that time, defense counsel sought to introduce Elijah's parole records and his judgment of conviction (JOC) from 2010,[2] over

---

[2] Elijah had previously been convicted of first-degree robbery, N.J.S.A. 2C:15-1 and second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a).

the State's objection. Defense counsel confirmed his purpose was to establish that Nijera and Robin were biased in favor of Elijah and would have lied on the stand to protect Elijah from a parole violation by testifying he did not have a gun or shoot it during the incident. We note by this point in the trial, defense counsel already had raised the possibility witnesses had fabricated what occurred during the shooting incident because of Elijah's parole status. Indeed, counsel advised jurors in his opening statement:

> [Elijah] brought a handgun that day. He was on parole . . . on the day of the fistfight with [defendant]. His family knew that, and his family knew that if he got rearrested with a gun charge, he'd go right back to prison, so they made this up. They said that [defendant] brought a gun to the fistfight, but he never did.

In response to defendant's application to introduce Elijah's JOC and parole records, the judge noted defense counsel "didn't ask [the victim's family] about parole," nor did he ask the detective who testified for the State about Elijah's parole status. She reminded defense counsel she had given him permission to ask "questions about parole," yet in his questioning of Elijah's family members, he "never used the word, [']parole.[']" She added that he "could have asked [the detective testifying for the State] questions with respect to if he knew [Elijah] was on parole." The judge inquired of defense counsel, "don't you think the ship sailed a bit on that in that the time to attack bias of a testifying witness is when

they're testifying?" Further, the judge stated, "prior convictions for violent crimes would be admissible to prove" a person's "violent nature" and "it could have been established through [the detective], it wasn't." Thus, she was "not sure if the ship has sailed as to how you get it in at this point." The judge subsequently stated:

> the defense seeks to introduce the prior conviction of the victim in this case, Elijah McQueen for two purposes. One, to establish the bias of Nijera McQueen and Robin McQueen. And second is character evidence of the victim, Elijah McQueen . . . .
>
> Prior to the cross-examination of Nijera and Robin McQueen, I'll now refer to them as McQueens, the court ruled that it would be permissible for the defense to inquire into whether or not either of the McQueens had knowledge that the victim was on parole. And the defense theory was that the McQueens' respective testimonies identifying the defendant was not only the possessor of the weapon, but the shooter, may not be credible as the McQueens' motive was to cover up Elijah McQueen, the fact that he was out on . . . parole. And as such, any hint of him possessing a gun or shooting a gun would have subjected him to a parole violation.
>
> Despite the court's ruling, defense did not ask either [of the] McQueens if they were aware that Elijah was on parole at the time of the incident and instead, the defense opted to . . . ask either of them if they knew if Mr. McQueen ever returned to jail after his period of incarceration. Both of the McQueens responded that they were unsure of the answer to the question and there

9

A-0697-19

was no follow up by the defense counsel. And as we know we can impeach a testifying witness for bias.

And so, in this case, . . . I think the ship had sailed with respect to impeaching the testimony of both the McQueens through the use of Elijah McQueen's prior conviction since those questions could have been asked at the time of the witnesses testifying.

Accordingly, the judge denied defendant's application to introduce Elijah's parole records, finding "[t]he issue of parole was not raised in cross-examination as noted. However, the [JOC] indicates a period of parole supervision and either party can argue it as it may with respect to the effect of . . . the victim's status on parole as to any issue in this case." The judge also stated evidence of Elijah's prior convictions could be utilized by the defense "[i]n the event that there is evidence introduced that renders the violent propensity of the victim relevant to this case." The judge further stated if the JOC was offered into evidence, she would likely "sanitize" the document to exclude original charges, fines and penalties paid, and "any aggravating and mitigating factors noted" but retain the "charges for which the defendant pled guilty . . . and the sentences imposed on such."

Defendant testified after the judge made these evidentiary rulings. Defendant stated he knew Elijah before he met Nijera and the two men were "close friends." He testified that on the day of the incident, Nijera and another

10

woman who was a friend of his fought with one another. He attested he had "nothing to do with that fight at all." Additionally, he stated he and Elijah "said a couple words [to each other] but . . . never physically fought" and Nijera and Elijah drove away. However, defendant admitted he and Elijah physically fought each other when they met up shortly thereafter and he "tackled" Elijah. Defendant testified that while the two were "wrestling" on the ground, he heard one gunshot, thought he "was getting shot at," so he "got up and ran" to his house. Also, he testified he never shot Elijah, never possessed a gun and when asked if he ever tried to "kill" Elijah, he responded, "I had no reason to."

After defendant's testimony concluded, the defense rested. When the trial resumed the following day, counsel and the court discussed and agreed on the jury instructions, and counsel provided their closing remarks. The judge then charged the jury and included in her instruction that jurors could view Elijah's JOC in redacted form and "consider all, part or none of it and the weight it is to be given." The judge also instructed the jurors that the State needed to prove "each element of a charge beyond a reasonable doubt." Regarding defendant's charge of possession of a firearm with the purpose to use it unlawfully, the judge defined the element of possession to mean "a conscious knowing possession," adding, "[a] person is in actual possession of an item when he first knows what

11

it is. That is, he has knowledge of its character." Turning to count three of the indictment, the judge instructed that to be convicted of the unlawful possession of a handgun, the State had to prove, in part, the element that "defendant knowingly possessed the handgun." She explained:

> To possess an item under the law one must have a knowing intentional control of an item accompanied by knowledge of its character. So, a person who possesses an item such as a handgun must know or be aware that he possesses it, and he must . . . know what it is that he possesses or controls, that is a handgun. The State must prove beyond a reasonable doubt that a possessor acted knowingly in possessing the item.
>
>     . . . .
>
> A person may possess a handgun even though it was not physically on his person at the time of his arrest if he had, in fact, at some point prior to his arrest had control over it. Possession means conscious knowing possession. A person is in actual possession of an item when he first knows what it is. That is, he has knowledge of its character.

Defense counsel voiced no objections to these instructions when they were given. Thus, the jurors began their deliberations and two days later, they found defendant guilty of unlawful possession of a weapon and not guilty of the remaining charges.

On appeal, defendant raises the following arguments:

POINT I

THE TRIAL COURT VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHT TO CONFRONTATION BY PREVENTING DEFENDANT FROM FULLY EXPLORING THE BIAS OF THE STATE'S WITNESSES NIJERA AND ROBIN MCQUEEN BY PROHIBITING EXAMINATION OF NIJERA ON THE NATURE OF ALL THREE CHARGES PENDING AGAINST HER AND PROHIBITING INTRODUCTION OF ELIJAH MCQUEEN'S PAROLE RECORDS.

A. The Court Erred In Precluding Defendant From Examining Nijera McQueen Regarding The Nature Of Count [Three] Of The Indictment Pending Against Her And In Failing To Instruct The Jury On The Relevant Permissible Inference To Be Drawn From Her Pending Charges. (Partially Raised Below).

B. The Court Erred In Excluding Elijah McQueen's Parole Records Showing He Was On Parole At The Time Of The Offense And Had Previously Violated Parole.

POINT II

DEFENDANT'S CONVICTION FOR POSSESSION OF A HANDGUN WITHOUT A PERMIT MUST BE REVERSED BECAUSE THE COURT FAILED TO SUFFICIENTLY DEFINE THE ELEMENT OF POSSESSION FOR THE JURY. (Not Raised Below).

We find these arguments are unavailing.

13

Regarding defendant's Point I contentions, we are mindful that we "review evidentiary rulings under an abuse of discretion standard." State v. Jackson, 243 N.J. 52, 64 (2020). "[A] trial court is afforded 'considerable latitude regarding the admission of evidence,' and [should] be reversed only if the court abused its discretion." Ibid. (quoting State v. Nelson, 173 N.J. 417, 470 (2002)). "[W]e accord no deference to the trial court's legal conclusions." Ibid. (quoting State v. Nantambu, 221 N.J. 390, 402 (2015)).

"If the evidence is deemed relevant, it is admissible, unless its probative value is substantially outweighed by the risk of [] undue prejudice or some other bar to its admission is properly interposed." Ibid. (internal quotation marks omitted and alteration in original). "The trial court 'has broad discretion to exclude evidence as unduly prejudicial pursuant to N.J.R.E. 403.'" Ibid. (quoting Nantambu, 221 N.J. at 402).

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee defendants the right to confront witnesses. U.S. Const. amends. VI and XIV; N.J. Const. art. 1, ¶ 10. "Our system permits exploration, through cross-examination, of a witness's motivation in testifying." Jackson, 243 N.J. at 65. "The Confrontation Clause

A-0697-19

permits a defendant to explore, in cross-examination, a prosecution witness's alleged bias." State v. Bass, 224 N.J. 285, 301 (2016).

A trial court, however, may "impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." Del. v. Van Arsdall, 475 U.S. 673, 679 (1986). "The trial court shall determine 'whether the circumstances fairly support an inference of bias' or whether the proposed examination raises any concerns." Jackson, 243 N.J. at 66 (quoting Bass, 224 N.J. at 303).

As our Supreme Court has instructed,

> Our Rules of Evidence start from the proposition that all relevant evidence is admissible, subject to delineated categories of excluded evidence. N.J.R.E. 402 ("Except as otherwise provided in these rules or by law, all relevant evidence is admissible."). Rule 607 permits, "for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness [to] examine the witness and introduce extrinsic evidence relevant to the issue of credibility," unless an exception within that rule applies  or  either Rule 405 or 608 renders  the evidence inadmissible.
>
> Those Rules preclude the use of specific instances of conduct to attack the credibility of a witness. N.J.R.E. 405 provides that "[s]pecific instances of conduct not the subject of a conviction of a crime shall be inadmissible,"

15

and N.J.R.E. 608 indicates that "a trait of character cannot be proved by specific instances of conduct" unless the prior act was a "false accusation against any person of a crime similar to the crime with which defendant is charged." Otherwise, relevant evidence may also be excluded on the ground that "its probative value is substantially outweighed by the risk of . . . undue prejudice." N.J.R.E. 403.

[State v. Scott, 229 N.J. 469, 481 (2017).]

Here, when the trial court barred defendant from questioning Nijera regarding one of her pending charges, it relied, in part, on N.J.R.E. 608 and the holding in Scott, noting that generally, "a trait of character cannot be proved by specific instances of conduct." The judge observed that defendant was "trying to show a dishonesty trait," even though Nijera was presumed innocent of her pending charges, and it would be unfairly prejudicial to allow defendant to use Nijera's pending charge of hindering by providing false information to a law enforcement officer to show "her potential untruthfulness when it's a trait o[f] character that's otherwise inadmissible under [Rule] 608." We perceive no abuse of discretion in this regard, particularly since defendant was given latitude to cross-examine Nijera regarding her two other pending charges, and was permitted to explore whether she was promised some type of benefit by law enforcement in exchange for her testimony at trial. We further note that Nijera made her initial statement to police before charges were lodged against her so

16

any suggestion by defendant that her corresponding testimony at trial was tied to her charges is unconvincing.

Similarly, given our deferential standard of review regarding a trial court's evidentiary rulings, we are not persuaded the judge erred in precluding defendant from introducing Elijah's parole records to show either Nijera or Robin may have lied about Elijah possessing or using a gun during the incident, given Elijah's parole status at the time of the March 2016 incident. Certainly, defendant was able to explore the potential bias of Nijera and Robin by addressing their familial relationship with Elijah. Moreover, as the judge noted, she allowed defense counsel to explore with both Nijera and Robin whether they knew Elijah was on parole, and counsel also could have asked the detective, when he testified for the State, if he knew Elijah's parole status at the time of the shooting. Nonetheless, defense counsel opted not to pursue a line of questioning involving Elijah's parole status when these witnesses testified. Therefore, we perceive no basis to disturb the judge's decision to preclude defendant from introducing Elijah's parole records once these witnesses had completed their testimony.

Regarding Point II, defendant claims the trial court failed to fully define the element of possession in its jury instructions. In particular, he contends the

jury instruction regarding the element of possession did not track with the Model Jury Charge so that the jury did not understand possession "signifies an intentional control and dominion." He adds, "[t]he trial court failed to include this definition of possession - - 'knowingly procured or received the thing possessed and was aware of his control thereof for a sufficient period to have been able to terminate his possession at any point' - - at any place in its instructions," and that this failure deprived him "of his rights to due process and a fair trial." We are not convinced.

The failure to charge an element of an offense ordinarily constitutes reversible error. State v. Green, 86 N.J. 281, 288-89 (1981). A defendant is entitled to a complete and accurate statement of law. State v. Thompson, 59 N.J. 396, 411 (1971). This requirement includes instructing the jury on all essential and fundamental issues and elements of each offense. Green, 86 N.J. at 290. "[E]rror in a jury instruction that is crucial to the jury's deliberations on the guilt of a criminal defendant is a poor candidate for rehabilitation." State v. Vallejo, 198 N.J. 122, 141 (2009) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)). Proper jury instructions are "essential to a fair trial" and incorrect instructions "are almost invariably regarded as prejudicial . . . ." State v. Vick, 117 N.J. 288, 289 (1989). "Nevertheless, an error in the charge that is clearly

A-0697-19

harmless and could not have affected the jury's deliberations will not warrant a reversal." Pressler & Verniero, Current N.J. Court Rules, cmt. 3.3.1 on R. 2:10-2 (2021). Additionally, "[t]he claim of harmful error in the charge will be determined by review of the entire charge and the context of the error . . . . Thus the charge as a whole may be deemed adequate even if not perfectly clear." Ibid.

Generally, "a defendant waives the right to contest an instruction on appeal if he does not object to the instruction." State v. Torres, 183 N.J. 554, 564 (2005). Here, defendant did not object to the judge's instruction regarding the element of possession that the State needed to prove regarding defendant's weapons offenses, notwithstanding that he had the opportunity to do so, both during the charging conference and when the jury was charged. Therefore, defendant is not entitled to a reversal of his conviction absent a showing of plain error, i.e., error "clearly capable of producing an unjust result." R. 2:10-2. Defendant has not met his burden in this regard.

Here, as we have indicated, the judge instructed the jury regarding the element of possession, stating, in part:

> To possess an item under the law one must have a knowing intentional control of an item accompanied by knowledge of its character. So, a person who possesses an item such as a handgun must know or be aware that he possesses it, and he must . . . know what it is that he possesses or controls, that is a handgun. The State must

19

prove beyond a reasonable doubt that a possessor acted knowingly in possessing the item.

. . . .

A person may possess a handgun even though it was not physically on his person at the time of his arrest if he had, in fact, at some point prior to his arrest had control over it.

Following these and other instructions regarding the element of possession, the jury acquitted defendant of possessing a weapon for an unlawful purpose and found him guilty of possessing a handgun without a permit. Under these circumstances, and viewing the judge's instructions in their entirety, we are not satisfied the judge committed error, let alone plain error, in her charge to the jury. Thus, we perceive no basis to disturb defendant's conviction.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0697-19